STAFFORD HIGGINS INDUSTRIES, INC.,
ET AL. *v.* CITY OF NORWALK ET AL.
(SC 15692)

Borden, Berdon, Norcott, Katz, Palmer, McDonald and O'Connell, Js.

Argued October 28, 1997—officially released July 21, 1998

*Frank W. Murphy,* with whom, on the brief, was *Barbara L. Coughlan,* for the appellant (intervening plaintiff).

*M. Jeffry Spahr,* deputy corporation counsel, for the appellees (defendants).

### Opinion

BORDEN, J. The principal issue of this appeal is whether the defendant city of Norwalk[1] acted constitutionally when, in 1994, it stayed the implementation of its decennial revaluation pursuant to No. 94-4, § 51, of the Public Acts, Spec. Sess., May, 1994 (Spec. Sess. P.A. 94-4, § 51). The plaintiff GTE Realty Corporation[2] appeals[3] from the judgment of the trial court in favor

---

[1] The defendants in this action, in addition to the city of Norwalk, are the mayor, the chairperson of the board of tax review, the tax assessor, the tax collector, and the president of the common council, all sued in their official capacities. Hereafter, we refer to the city as the defendant.

[2] The original plaintiffs in this case were Stafford Higgins Industries, Inc., Richard Hodgson, Walter Baum, James Corless and JoMur Associates. Thereafter, Corless withdrew his action, and Cambridge Associates and GTE Realty Corporation intervened as plaintiffs and filed their own intervening complaints. In addition, a number of other entities and individuals later intervened as plaintiffs. After the trial court rendered judgment, however, only GTE Realty Corporation appealed. Hereafter, we refer to GTE Realty Corporation as the plaintiff.

[3] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023, now Practice Book (1998 Rev.) § 65-1, and General Statutes § 51-199 (c).

of the defendant. The plaintiff claims that the trial court improperly: (1) concluded that the defendant had validly postponed the revaluation for purposes of the grand lists of October 1, 1993 and 1994; (2) concluded that Spec. Sess. P.A. 94-4, § 51, is constitutional, both as enacted and as applied by the defendant to the plaintiff; and (3) declined to consider the plaintiff's challenge to the defendant's subsequent postponements of the implementation of the revaluation, with regard to the 1995 and 1996 grand lists, which took place during the pendency of this case. Addressing the merits of those subsequent actions by the defendant, the plaintiff also claims that they were invalid. We conclude that: (1) the defendant's actions in postponing the revaluation for purposes of the 1993 and 1994 grand lists was valid; (2) there is no constitutional infirmity in Spec. Sess. P.A. 94-4, § 51, either as enacted or as implemented by the defendant; (3) under the circumstances of this case, the trial court should have adjudicated the plaintiff's claims regarding the 1995 and 1996 grand lists; and (4) under No. 97-254, § 1 (b) (1) of the 1997 Public Acts (P.A. 97-254), the defendant may postpone its revaluation until 1999. Accordingly, we affirm the judgment in part and reverse the judgment in part.

In its intervening complaint, the plaintiff challenged the defendant's action of staying the implementation of the defendant's October 1, 1993 decennial revaluation, which had the effect of retaining the real property valuations of October 1, 1983, for the grand lists of 1993 and 1994. That action had been taken in 1994, pursuant to Spec. Sess. P.A. 94-4, § 51, later codified as General Statutes (Rev. to 1995) § 12-62h,[4] which the plaintiff

[4] General Statutes (Rev. to 1995) § 12-62h, as enacted by Spec. Sess. P.A. 94-4, § 51, provides: "Stay and phase-in of implementation of revaluation. (a) Notwithstanding any provision of this title, the local legislative body of a municipality may, at its option, stay the implementation of such municipality's revaluation in order to implement the recommendations of the Property Tax Reform Commission enacted during the 1995 session of the general

claimed was unconstitutional. The plaintiff's complaint contained two counts. In the first count, the plaintiff appealed from its tax assessment pursuant to General

assembly. The local legislative body of a municipality may stay such implementation for a period or periods not to exceed in the aggregate two years. Any distressed municipality shall by majority vote of its legislative body approve such stay and any municipality, other than a distressed municipality shall by two-thirds vote of its legislative body approve such stay. Any municipality required to implement revaluation for the assessment year commencing October 1, 1993, which has not as of February 15, 1994, adopted mill rates for taxes due July 1, 1994, may use such municipality's most recently completed grand list prior to revaluation as updated by any additions, deletions, splits, combinations and other changes in ownership as of October 1, 1993, provided any such municipality may commence a phase-in of its revaluation pursuant to subsection (e) of section 12-62a or section 12-62c with respect to such assessment year and may after the first year of such phase-in stay the further implementation of such phase-in in accordance with the provisions of this section. Any municipality required to implement revaluation for the year commencing October 1, 1994, which has not as of February 15, 1995, adopted a mill rate for taxes due July 1, 1995, may use such municipality's most recently completed grand list prior to revaluation as updated by any additions, deletions, splits, combinations and other changes of ownership as of October 1, 1994. Any municipality which has elected to defer all or any part of the amount of increase in the assessed value of real property as approved by the legislative body of such municipality, pursuant to subsection (e) of section 12-62a or 12-62c, and which has not as of June 9, 1994, adopted a mill rate for taxes for July 1, 1994, may, subject to approval by the legislative body of such municipality, stay the further implementation of such phase-in, so that the assessed value shall not include such further increments in value for the grand lists of October 1, 1993 and October 1, 1994, as provided for in such plan. On and after December 31, 1995, each municipality shall comply with all provisions of any new property tax statutes enacted during the 1995 session of the general assembly for implementation as of July 1, 1996. If during the 1995 session of the general assembly no legislation is enacted concerning property tax reform each municipality which has stayed the implementation of revaluation or phase-in of revaluation shall recommence the implementation of such revaluation or phase-in upon the expiration of any stay implemented according to the provisions of this section.

"(b) Any municipality which has elected to stay the implementation of a phase-in of revaluation, pursuant to this section, shall, at the expiration of such stay, resume such phase-in at the point where such municipality would have been during the first year in which such stay was implemented if such stay was not implemented."

Statutes § 12-119,[5] claiming that its tax assessment was illegal because of, inter alia, the unconstitutionality of Spec. Sess. P.A. 94-4, § 51. In the second count, the plaintiff sought a declaratory judgment that Spec. Sess. P.A. 94-4, § 51, was unconstitutional.

The plaintiff's complaint purported to be limited to a challenge to the defendant's 1994 staying of the revaluation, affecting the grand lists of 1993 and 1994, and the plaintiff did not submit an amended complaint formally expanding its claims beyond those grand lists. Nonetheless, the record discloses that the parties[6] subsequently also submitted to the trial court the question of whether the defendant acted legally in further staying the revaluation, such that it was not implemented for the grand lists of October 1, 1995, and

[5] General Statutes § 12-119 provides: "Remedy when property wrongfully assessed. When it is claimed that a tax has been laid on property not taxable in the town or city in whose tax list such property was set, or that a tax laid on property was computed on an assessment which, under all the circumstances, was manifestly excessive and could not have been arrived at except by disregarding the provisions of the statutes for determining the valuation of such property, the owner thereof or any lessee thereof whose lease has been recorded as provided in section 47-19 and who is bound under the terms of his lease to pay real property taxes, prior to the payment of such tax, may, in addition to the other remedies provided by law, make application for relief to the superior court for the judicial district in which such town or city is situated. Such application may be made within one year from the date as of which the property was last evaluated for purposes of taxation and shall be served and returned in the same manner as is required in the case of a summons in a civil action, and the pendency of such application shall not suspend action upon the tax against the applicant. In all such actions, the Superior Court shall have power to grant such relief upon such terms and in such manner and form as to justice and equity appertains, and costs may be taxed at the discretion of the court. If such assessment is reduced by said court, the applicant shall be reimbursed by the town or city for any overpayment of taxes in accordance with the judgment of said court."

[6] The defendant disputes that the parties submitted the questions of the 1995 and 1996 tax assessments to the trial court. We conclude that they did, as discussed more fully in part III of this opinion.

October 1, 1996, pursuant to No. 95-283, § 8, of the 1995 Public Acts (P.A. 95-283),[7] and No. 96-218, §§ 1

[7] Number 95-283, § 8, of the 1995 Public Acts provides: "Subsection (a) of section 12-62h of the general statutes is repealed and the following is substituted in lieu thereof:

"(a) Notwithstanding any provision of this title, the local legislative body of a municipality may, at its option, stay the implementation of such municipality's revaluation in order to implement the recommendations of the Property Tax Reform Commission enacted during the 1995 session of the general assembly. The local legislative body of a municipality may stay such implementation for a period or periods not to exceed in the aggregate three years. Any distressed municipality shall by majority vote of its legislative body approve such stay and any municipality, other than a distressed municipality shall by two-thirds vote of its legislative body approve such stay. Any municipality required to implement revaluation for the assessment year commencing October 1, 1993, which has not as of February 15, 1994, adopted mill rates for taxes due July 1, 1994, may use such municipality's most recently completed grand list prior to revaluation as updated by any additions, deletions, splits, combinations and other changes in ownership as of October 1, 1993, provided any such municipality may commence a phase-in of its revaluation pursuant to subsection (e) of section 12-62a or section 12-62c with respect to such assessment year and may after the first year of such phase-in stay the further implementation of such phase-in in accordance with the provisions of this section. Any municipality required to implement revaluation for the year commencing October 1, 1994, which has not as of February 15, 1995, adopted a mill rate for taxes due July 1, 1995, may use such municipality's most recently completed grand list prior to revaluation as updated by any additions, deletions, splits, combinations and other changes of ownership as of October 1, 1994. Any municipality which has elected to defer all or any part of the amount of increase in the assessed value of real property as approved by the legislative body of such municipality, pursuant to subsection (e) of section 12-62a or 12-62c, and which has not as of June 9, 1994, adopted a mill rate for taxes for July 1, 1994, may, subject to approval by the legislative body of such municipality, stay the further implementation of such phase-in, so that the assessed value shall not include such further increments in value for the grand lists of October 1, 1993 and October 1, 1994, as provided for in such plan. Any municipality required to implement revaluation for the year commencing October 1, 1995, which has not as of February 15, 1996, adopted a mill rate for taxes due July 1, 1996, may use such municipality's most recently completed grand list prior to revaluation as updated by any additions, deletions, splits, combinations and other changes of ownership as of October 1, 1995. Any municipality which has elected to defer all or any part of the amount of increase in the assessed value of real property as approved by the legislative body of such municipality, pursuant to subsection (e) of section 12-62a or 12-62c, and which has not as of June 9, 1995, adopted a mill rate for taxes for July

and 3, of the 1996 Public Acts (P.A. 96-218).[8]

The following facts are undisputed. Since 1980, the plaintiff has owned real property in Norwalk, located

1, 1995, may, subject to approval by the legislative body of such municipality, stay the further implementation of such phase-in, so that the assessed value shall not include such further increments in value for the grand lists of October 1, 1994, and October 1, 1995, as provided for in such plan. On and after December 31, 1996, each municipality shall comply with all provisions of any new property tax statutes enacted during the 1995 session of the general assembly for implementation as of July 1, 1997. If during the 1995 session of the general assembly no legislation is enacted concerning property tax reform each municipality which has stayed the implementation of revaluation or phase-in of revaluation shall recommence the implementation of such revaluation or phase-in upon the expiration of any stay implemented according to the provisions of this section."

[8] Number 96-218 of the 1996 Public Acts provides in relevant part: "Section 1. Section 12-62 of the general statutes, as amended by section 3 of public act 95-283, is repealed and the following is substituted in lieu thereof:

"(a) (1) (A) The assessor or board of assessors of each town which levies real property taxes on the basis of a revaluation that was implemented for an assessment year commencing on or before October 1, 1986, shall, for the assessment year commencing October 1, 1997, revalue all real property for assessment purposes by physical observation . . . .

"Section 3. Section 12-62h of the general statutes, as amended by section 8 of public act 95-283, is repealed and the following is substituted in lieu thereof:

"(a) Notwithstanding any provision of this title, the local legislative body of a municipality may, at its option, stay the implementation of such municipality's October 1, 1993, 1994, or 1995 revaluation, for a period not to exceed three years, two years and one year, respectively, in order to implement the recommendations of the Property Tax Reform Commission enacted during the 1995 session of the General Assembly and any revisions thereto as enacted during the 1996 session of the General Assembly. On or before the date by which a mill rate to provide for the levy of taxes relative to any such assessment year is established, any distressed municipality, as defined in subsection (b) of section 32-9p, shall by majority vote of its legislative body approve such stay and any municipality, other than a distressed municipality shall by two-thirds vote of its legislative body approve such stay. The assessors of any municipality in which the legislative body approves a stay of revaluation in accordance with the provisions of this section, may use such municipality's most recently completed grand list prior to revaluation as updated by any additions, deletions, splits, combinations and other changes in ownership as of the October first date which, except for such approval, would be the effective date of revaluation. Alternatively, any such municipality, except a municipality implementing revaluation as of October

at 32 Weed Avenue, where it operates a management and development center. In 1993, the defendant conducted a decennial revaluation of all real property located in the city for purposes of establishing a new grand list as of October 1, 1993 (1993 revaluation), pursuant to General Statutes (Rev. to 1993) § 12-62 (a).[9] The previous revaluation had been in 1983, based on

1, 1995, may commence a phase-in of its revaluation pursuant to subsection (e) of section 12-62a, as amended by section 2 of this act, or section 12-62c, as amended, with respect to such assessment year and may after the first year of such phase-in stay the further implementation of such phase-in.

"(b) (1) The assessor of each municipality having stayed the implementation of an October 1, 1993, 1994, or 1995 revaluation, shall, on the grand list for the assessment year commencing October 1, 1996, reflect assessments based upon the revaluation that was stayed. The assessor of each municipality having stayed the further implementation of phase-in with respect to a revaluation implemented on October 1, 1993, shall, on the grand list for the assessment year commencing October 1, 1996, recommence such phase-in by reflecting assessments that include the incremental value that would, except for such stay, have been added in the assessment year commencing October 1, 1994, and for each assessment year thereafter, until the term of the phase-in as adopted by the municipality is completed, such assessors shall reflect assessments which include the addition of the applicable phase-in increment. Any municipality which has elected to defer all or part of the increase in the assessed value of real property pursuant to section 12-62a, as amended by section 2 of this act, or 12-62c, as amended, shall, as of October 1, 1996, reflect ownership and valuation changes for each assessment year during such stay.

"(2) Notwithstanding the provisions of any special act or this section any municipality which elected to defer further implementation of a phase-in adopted pursuant to section 12-62c, as amended, or pursuant to subsection (e) of section 12-62a, as amended by section 2 of this act, may continue to defer the further implementation of such phase-in for the assessment years commencing October 1, 1995, and October 1, 1996, provided ownership and appropriate valuation changes with respect to such assessment years shall be reflected. The grand list of any such municipality for the assessment year commencing October 1, 1997, shall include assessments that reflect seventy per cent of the fair market value of real property as determined in accordance with said revaluation."

[9] General Statutes (Rev. to 1993) § 12-62 (a) provides: "Commencing October 1, 1993, the assessors of all towns, consolidated towns and cities and consolidated towns and boroughs shall, no later than ten years following the effective date of the last preceding revaluation of all real property and every ten years thereafter, revalue all of the real estate in their respective

real property values as of that time (1983 revaluation). On the basis of the 1993 revaluation, the defendant established a proposed 1993 grand list. The plaintiff was notified that, as of October 1, 1993, its assessment would be $22,750,420. The plaintiff appealed its 1993 assessment to the board of tax review.[10]

On January 24, 1994, however, the director of finance reported to the board of estimate and finance[11] that, after revaluation, revenues from commercial and industrial properties would decline from 26.9 percent to 25.6 percent of the grand list, revenues from condominiums would decline from 10.3 percent to 8.9 percent of the grand list, and revenues from noncondominium residences would increase from 45.6 percent to 53.5 percent of the grand list. On March 8, 1994, at the meeting of the common council, the mayor was granted authorization to seek permission from the state to defer implementation of the revaluation for no more than three years. Pursuant to General Statutes (Rev. to 1993) § 12-117,[12] however, the state office of policy and management may grant a municipality an extension of no more

municipalities for assessment purposes, in accordance with the provisions of subsection (b) of this section. The assessments derived from each such revaluation shall be used for the purpose of levying property taxes in such municipality in the assessment year in which such revaluation becomes effective and in each assessment year thereafter until the next succeeding revaluation in accordance with this section becomes effective. In the performance of these duties, except in any municipality where there is a single assessor, at least two of the assessors shall act together, and all valuations shall be separately approved by a majority of the assessors."

[10] Ultimately, the board of tax review declined to change the plaintiff's assessment. The plaintiff filed an appeal from that action pursuant to General Statutes § 12-117a, which is still pending. Unless the 1993 revaluation is implemented, however, that appeal will be rendered moot.

[11] Under the Norwalk charter, the board of estimate and finance is responsible for the assessment and collection of taxes, and for preparation of the municipal budget for submission to the mayor, the board of estimate and taxation, and the common council.

[12] General Statutes (Rev. to 1993) § 12-117 provides: "Extension of time for completion of duties of assessors and board of tax review. The period prescribed by law for the completion of the duties of any assessor, board

than two months to complete the process of hearing taxpayers' appeals regarding a revaluation. On March 16, 1994, the board of tax review and the mayor wrote to the office of policy and management seeking a one year extension. The office of policy and management, however, granted only a two month extension, until May 31, 1994, as permitted by the statute.[13]

On April 22, 1994,[14] the board of estimate and taxation established a final budget and mill rate based, not on the 1993 revaluation, but on the 1983 revaluation. This had the effect on real property owners, including the

of assessors or board of tax review may, for due cause shown, be extended by the secretary of the office of policy and management for a period not exceeding one month, and in the case of the board of tax review in any town in the assessment year immediately following completion of a revaluation of all real property in such town and adjustment of the assessment list for such assessment year accordingly, such period may be extended by said secretary for a period not exceeding two months, provided such assessor or board shall submit to said secretary, not less than ten days before the expiration of the period prescribed by law, a request in writing, approved by the chief executive officer of the municipality, for such extension, setting forth the reasons therefor. If, in the opinion of the board of tax review and the chief executive officer, the number of appeals pending before such board is such as to preclude fair and equitable consideration of such appeals within the time restriction prescribed herein, the secretary of the office of policy and management may, upon the request in writing of the board of tax review approved by the chief executive officer, setting forth such opinion, authorize the assessors to assess all real estate according to the list in effect immediately prior to the list from which such appeals are taken, subject only to transfers of ownership, additions for new construction and reductions for demolitions. The list from which such appeals are taken shall then become the list for the assessment day next ensuing, subject only to such adjustments as are authorized by the board of tax review, unless the town has, in the intervening time period, completed a revaluation of all real property in accordance with section 12-62. If an extension is granted to any board of tax review, the time within which any taxpayer may appeal from the decision of such board and the time within which the town clerk shall transmit an abstract of the assessment lists shall be extended for a like period."

[13] The office of policy and management denied the defendant's subsequent request for an additional one year extension.

[14] The Norwalk charter requires the board of estimate and taxation, on the first Monday of April, to establish the budget and adopt a mill rate based on the grand list.

plaintiff, of carrying forward the 1992 grand list, based on the values of real property as of 1983, rather than 1993.

Under the 1983 revaluation, the plaintiff's assessment was $24,058,826, resulting in a tax bill of $1,119,938.35. Under the defendant's proposed 1993 revaluation, which has not been implemented, the plaintiff's assessment would have been $22,750,420 and, under the defendant's proposed mill rate, the plaintiff's tax bill would have been $687,290.19. As a result of the deferment of the 1993 revaluation, therefore, the plaintiff's tax bill on the 1993 grand list was increased by $432,648.16, or 39 percent, over what it would have been had the 1993 revaluation been implemented.

On or about June 1, 1994, while the plaintiff's appeal to the board of tax review was pending, the defendant issued tax bills, based on the 1983 revaluation, accompanied by a letter from the mayor stating that the implementation of the 1993 revaluation had been postponed. Prior to the issuance of these tax bills, the board of tax review did not hold hearings on appeals by taxpayers potentially aggrieved by the 1993 assessment.

On June 9, 1994, Spec. Sess. P.A. 94-4 became effective. See Spec. Sess. P.A. 94-4, § 85. Section 51 of Spec. Sess. P.A. 94-4,[15] in general terms, permits the legislative body of a municipality to stay the implementation of a decennial revaluation for up to two years. On June 28, 1994, the common council suspended its rules and, purporting to act pursuant to Spec. Sess. P.A. 94-4, passed a resolution, not listed on its agenda, authorizing the stay of the implementation of the 1993 revaluation. In the discussion of this resolution, the corporation counsel described this action as a ratification of the common council's prior decision to request a stay of the 1993 revaluation. Thereafter, on December 27, 1994,

---

[15] See footnote 4 of this opinion.

the common council also voted to stay the implementation of the 1993 revaluation until July 1, 1996. In addition, during the pendency of this case, the defendant has enacted further postponements of the revaluation, which have had the effect of retaining the 1983 real property valuations for the grand lists of 1995 and 1996.

The trial court rejected the plaintiff's various statutory and constitutional challenges to the defendant's actions in staying the 1993 revaluation. The court declined to consider, however, the plaintiff's challenge to the defendant's action in further postponing the revaluation for the 1995 and 1996 grand lists, which steps the defendant purportedly had taken pursuant to P.A. 95-283, § 8, and P.A. 96-218, §§ 1 and 3. Accordingly, the court rendered judgment for the defendant with respect to the stay of the 1993 revaluation, affecting only Spec. Sess. P.A. 94-4, § 51, and the 1993 and 1994 grand lists. This appeal followed.

I

The plaintiff first claims that the defendant did not validly postpone the revaluation for purposes of the 1993 and 1994 grand lists. The plaintiff relies on the conclusion of the trial court that the defendant's action on June 28, 1994, purporting to ratify its prior decision to postpone the 1993 revaluation, could not be a valid ratification because, prior to Spec. Sess. P.A. 94-4, the defendant had no such power of postponement. The plaintiff contends, therefore, that the defendant's action in postponing the 1993 revaluation was invalid. We disagree.

It is true that the trial court concluded that, prior to the enactment of Spec. Sess. P.A. 94-4, the defendant was without any power to postpone the 1993 revaluation and that, therefore, any attempt to *ratify* what was in effect an ultra vires act was ineffective. It does not

follow from that conclusion, however, that the defendant's action on June 28, 1994, was also ineffective to postpone the 1993 revaluation pursuant to Spec. Sess. P.A. 94-4, § 51.

As the trial court also concluded, correctly, Spec. Sess. P.A. 94-4, § 51, by its terms had retrospective effect, and the defendant's June 28, 1994 resolution, which was specifically authorized by and passed pursuant to that act, validly postponed the 1993 revaluation. Thus, although the defendant's June 28, 1994 resolution could not validly have had the effect of *ratifying* the defendant's action in postponing the revaluation prior to the enactment of Spec. Sess. P.A. 94-4, once that act became effective on June 9, 1994, the same resolution, passed pursuant to Spec. Sess. P.A. 94-4, did have the legal effect of postponing the revaluation.

Section 51 of Spec. Sess. P.A. 94-4; see footnote 4 of this opinion; provided in pertinent part: "Notwithstanding any provision of title 12 of the general statutes, the local legislative body of a municipality may, at its option, stay the implementation of such municipality's revaluation in order to implement the recommendations of the Property Tax Reform Commission enacted during the 1995 session of the general assembly. The local legislative body of a municipality may stay such implementation for a period or periods not to exceed in the aggregate two years. . . . *Any municipality required to implement revaluation for the assessment year commencing October 1, 1993, which has not as of February 15, 1994, adopted mill rates for taxes due July 1, 1994, may use such municipality's most recently completed grand list prior to revaluation . . . . Any municipality required to implement revaluation for the year commencing October 1, 1994, which has not as of February 15, 1995, adopted a mill rate for taxes due July 1, 1995, may use such municipality's most*

*recently completed grand list prior to revaluation . . . ."* (Emphasis added.)

Legislation is generally presumed to operate prospectively, unless the legislature makes clear its intent that it operate retrospectively. *Bayusik* v. *Nationwide Mutual Ins. Co.*, 233 Conn. 474, 483–84, 659 A.2d 1188 (1995). The text of Spec. Sess. P.A. 94-4, § 51, itself makes clear the legislative intent that it apply retrospectively, because it makes its application conditional on events that preceded its effective date of June 9, 1994, namely, whether a municipality had adopted mill rates as of the previous February 15. It is equally clear that the defendant met all of these conditions because it had not adopted a mill rate as of February 15, 1994, and further, it did not adopt a mill rate as of February 15, 1995. Therefore, when the common council, on June 28, 1994, voted to stay the implementation of the revaluation with respect to the 1993 and 1994 grand lists, it acted legally pursuant to Spec. Sess. P.A. 94-4, § 51.

II

The plaintiff next claims that Spec. Sess. P.A. 94-4, § 51, is unconstitutional under the federal and state constitutions because: (1) it "is void of standards" and, therefore, involves an impermissible delegation of legislative power in violation of due process of law; (2) it is void for vagueness in violation of due process of law; and (3) it deprives the plaintiff of the equal protection of the laws.[16] None of these claims is persuasive.

---

[16] With respect to the plaintiff's first constitutional claim, namely, an impermissible delegation of legislative power to the defendant, the controlling case of *Bottone* v. *Westport*, 209 Conn. 652, 553 A.2d 576 (1989), implicates both the federal and state constitutions. We therefore consider that claim under both constitutions. With respect to the second and third claims, however, the plaintiff has not presented an adequate and independent state constitutional analysis. We therefore consider those claims only under the federal constitution. *Worsham* v. *Greifenberger*, 242 Conn. 432, 436 n.5, 698 A.2d 867 (1997); *State* v. *Campbell*, 224 Conn. 168, 181 n.10, 617 A.2d 889 (1992), cert. denied, 508 U.S. 919, 113 S. Ct. 2365, 124 L. Ed. 2d 271 (1993).

Legislation is presumed to be constitutional, and a litigant challenging its validity has the heavy burden to establish its unconstitutionality beyond a reasonable doubt. *State* v. *Wilchinski*, 242 Conn. 211, 217–18, 700 A.2d 1 (1997). The plaintiff has not met this burden.

A

The plaintiff's claim that Spec. Sess. P.A. 94-4, § 51, involves an impermissible delegation of legislative power founders on this court's holding in *Bottone* v. *Westport*, 209 Conn. 652, 553 A.2d 576 (1989). The limitation that the legislature may not delegate its power without establishing primary standards or an intelligible principle for carrying out that power emanates from the constitutional doctrine of the separation of powers. Id., 660. "The separation of powers doctrine, however, does not pertain to delegations from the state legislature to a municipality." Id., 664. "[T]hus, a nondelegation rule grounded in that constitutional limitation is inapposite . . . ." Id.

B

The plaintiff's claim that Spec. Sess. P.A. 94-4, § 51, is void for vagueness and, therefore, violative of due process of law, is also unpersuasive. When a legislature delegates its power to a municipality, "none of the limitations imposed on administrative or executive agencies applies. Thus, the delegation may be of the most general nature and it will not be invalid for failure to create an adequate standard." (Internal quotation marks omitted.) *Bottone* v. *Westport*, supra, 209 Conn. 668–69. Under the due process vagueness rubric, "the proper standard for a delegation of power from the state legislature to a municipality, based on both constitutional analysis and the reality of state and local governmental relations, is that such a delegation should be judged by whether it provides reasonable notice of what conduct

may be authorized or prohibited under its provisions." Id., 675.

Judged by this standard, Spec. Sess. P.A. 94-4, § 51, passes constitutional muster. The act authorized the defendant, at the option of its common council, to stay the implementation of its decennial revaluation, in order to implement the recommendations of the property tax reform commission that the legislature expected to be enacted in the 1995 session of the General Assembly. It conditioned that authority on the determination of whether, as of February 15, 1994, the defendant had adopted a mill rate. There is nothing unconstitutionally vague about these directions to the defendant regarding what conduct was authorized.

C

The plaintiff's final constitutional challenge is to the defendant's application to the plaintiff of Spec. Sess. P.A. 94-4, § 51. The plaintiff claims that, in staying the implementation of the revaluation pursuant to Spec. Sess. P.A. 94-4, the defendant deprived the plaintiff of the equal protection of the laws because the defendant "deliberately and intentionally acted for the benefit of one classification of taxpayers," namely, single-family residential homeowners, "to the detriment of others," namely, commercial property owners such as the plaintiff. In this regard, the plaintiff relies heavily on the trial court's finding that the common council "voted to stay its decennial revaluation of real property because of a shift in the tax burden to single-family homeowners from nonsingle-family property owners which would result." We reject the plaintiff's claim.

The parties agree, as do we, that the constitutionality of the defendant's action taken pursuant to Spec. Sess. P.A. 94-4, § 51, must be gauged under the rational basis test. "In the context of an equal protection challenge to social and economic legislation that does not infringe

upon a fundamental right or affect a suspect group, the classification drawn by the statute will not violate the equal protection clause if it is rationally related to a legitimate public interest. *Nordlinger* v. *Hahn*, 505 U.S. 1, 8, 112 S. Ct. 2326, 120 L. Ed. 2d 1 (1992); *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U.S. 432, 439–41, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). . . .

"The United States Supreme Court has recently summarized the rational basis test as applied to social and economic legislation that does not infringe upon a fundamental right or affect a suspect group. *Nordlinger* v. *Hahn*, supra, [505 U.S. 11–12]. In general, the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, see *United States Railroad Retirement Board* v. *Fritz*, 449 U.S. 166, 174, 179 [101 S. Ct. 453, 66 L. Ed. 2d 368 (1980), reh. denied, 450 U.S. 960, 101 S. Ct. 1421, 67 L. Ed. 2d 385 (1981)], the legislative facts on which the classification is apparently based rationally may have been considered to be true by the government decisionmaker, see *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U.S. 456, 464 [101 S. Ct. 715, 66 L. Ed. 2d 659, reh. denied, 450 U.S. 1027, 101 S. Ct. 1735, 68 L. Ed. 2d 222] (1981), and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational, see *Cleburne* v. *Cleburne Living Center, Inc.*, [supra, 473 U.S. 446]. *Nordlinger* v. *Hahn*, supra, [11].

"Moreover . . . [i]n the context of tax legislation, a party challenging a statute on equal protection grounds has an even greater burden than equal protection challenges to other social and economic statutes that do not infringe upon a fundamental right or affect a suspect group. In tax matters, more so than in other fields, legislatures possess considerable liberty in classification. *Gallacher* v. *Commissioner of Revenue Services*,

221 Conn. 166, 181, 602 A.2d 996 (1992); see also *Nordlinger* v. *Hahn,* supra, [505 U.S. 11–12] (upholding California's property tax scheme under Proposition 13 against equal protection challenge); *Regan* v. *Taxation with Representation of Washington,* 461 U.S. 540, 547, 103 S. Ct. 1997, 76 L. Ed. 2d 129 (1983) (denial of tax exemption to nonprofit lobbying organizations, but with an exception for veterans groups, does not violate equal protection).

"Therefore, the presumption of constitutionality can be overcome only by the most explicit demonstration that the classification is a hostile and oppressive discrimination against particular persons and classes. The burden is on the one attacking the legislative arrangement to negative *every conceivable basis* which might support it. . . . *Miller* v. *Heffernan,* 173 Conn. 506, 509–10, 378 A.2d 572 (1977), appeal dismissed, 434 U.S. 1057, 98 S. Ct. 1226, 55 L. Ed. 2d 758 (1978)." (Emphasis in original; internal quotation marks omitted.) *Johnson* v. *Meehan,* 225 Conn. 528, 535–37, 626 A.2d 244 (1993). Furthermore, when a court determines whether a legislative classification is a hostile and oppressive discrimination against a particular class, the challenger must establish that the legislature "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator of Massachusetts* v. *Feeney,* 442 U.S. 256, 279, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979).

Under this well established equal protection jurisprudence, the plaintiff's challenge to the defendant's action in staying the implementation of the revaluation fails. The most obvious rational basis for the defendant's action was to implement, in an orderly manner, the changes to the existing property taxation system anticipated to be enacted in the next legislative session as a result of the recommendations of the property tax

reform commission.[17] See *United Illuminating Co.* v. *New Haven*, 179 Conn. 627, 648, 427 A.2d 830, appeal dismissed, 449 U.S. 801, 101 S. Ct. 45, 66 L. Ed. 2d 5 (1980) (tax phase-in statute and local ordinance implementing it did not violate equal protection clause notwithstanding that phase-in act resulted in continued temporary inequities that mandatory periodic revaluation and uniform assessment rate were designed to ameliorate). That this "purpose may conceivably . . . have been the purpose and policy of the relevant governmental decisionmaker"; (internal quotation marks omitted) *Nordlinger* v. *Hahn*, supra, 505 U.S. 15; is demonstrated by the fact that it was the stated purpose of Spec. Sess. P.A. 94-4, § 51, pursuant to which the defendant acted.

The plaintiff's reliance on the trial court's finding, namely, that the defendant stayed its decennial revaluation because of a shift in the tax burden from single-family homeowners to nonsingle-family homeowners that would result, is misplaced. First, the plaintiff ignores the trial court's concomitant finding that the defendant "chose this course, however, not to burden commercial property owners but to alleviate the burden on single-family homeowners, that is, 'in spite of,' not 'because of' the burden which would, be assumed by nonsingle-family property owners." Thus, the trial court recognized the economic reality that when a legislative body makes a taxing decision it almost inevitably will be involved in shifting tax burdens from one group to another. The defendant's motivation did not offend the equal protection clause, however, because it was made in spite of, not because of, the burden it placed on

---

[17] In fact, in 1995, the General Assembly passed P.A. 95-283, § 3, amending General Statutes (Rev. to 1995) § 12-62, which previously had required all municipalities to conduct a complete reassessment every ten years. After that amendment, a new physical revaluation was required every twelve years, and a statistical revaluation was required every four and eight years after each physical revaluation. See P.A. 95-283, § 3.

commercial property owners. *Personnel Administrator of Massachusetts* v. *Feeney,* supra, 442 U.S. 279. Put another way, the plaintiff has failed to make " 'the most explicit demonstration that the classification [was] a hostile and oppressive discrimination against particular persons and classes.' " *Johnson* v. *Meehan,* supra, 225 Conn. 537.

Second, and more important, the plaintiff's reliance on the political motivations of the defendant's officials in staying the decennial revaluation is simply not in accord with current United States Supreme Court rational basis analysis, which is binding on this court in applying federal constitutional principles. The Supreme Court has stated the test under equal protection principles when the challenged legislation does not involve fundamental rights or suspect categories as follows: "Where, as here, there are plausible reasons for [the legislative body's] action, our inquiry is at an end. It is, of course, constitutionally irrelevant whether this reasoning in fact underlay the legislative decision . . . ." (Citation omitted; internal quotation marks omitted.) *United States Railroad Retirement Board* v. *Fritz,* supra, 449 U.S. 179. We have consistently followed this course in applying rational basis analysis to equal protection claims. See, e.g., *Johnson* v. *Meehan,* supra, 225 Conn. 539;[18] *United Illuminating Co.* v. *New Haven,* supra, 179 Conn. 639.

Third, even if we were to assume that the defendant acted in order to protect single-family homeowners

---

[18] Indeed, in *Johnson* v. *Meehan,* supra, 225 Conn. 539, we concluded that the taxing statute at issue was constitutional notwithstanding that "a discussion concerning a rational basis differentiating between the financial ability between the two groups [could] not be found in the legislative history," and notwithstanding the dissent's identification of evidence in the legislative history indicative of an intent by some legislators to discriminate against the group of prison inmates burdened by the tax. See id., 554–57 (*Berdon, J.,* dissenting).

from increased taxes, that would not necessarily be unconstitutional. The government may, without violating the equal protection clause, impose different tax burdens on different classes of property. See, e.g., *Allegheny Pittsburgh Coal Co.* v. *County Commission of Webster County, West Virginia,* 488 U.S. 336, 344, 109 S. Ct. 633, 102 L. Ed. 2d 688 (1989); *United Illuminating Co.* v. *New Haven,* supra, 179 Conn. 647. Furthermore, in *United Illuminating Co.* v. *New Haven,* supra, 647, we specifically indicated that the goal of protecting residential property owners from a sudden increase in taxation due to revaluation was a legitimate basis for legislation that authorized delay in the implementation of a new taxation scheme, despite the fact that the delay temporarily thrust an unequal burden of taxation on other categories of real property owners.

## III

We next consider the plaintiff's claim that the trial court improperly concluded that it lacked subject matter jurisdiction to adjudicate the plaintiff's contentions that further postponements of the revaluation by the defendant, pursuant to P.A. 95-283, § 8, and P.A. 96-218, §§ 1 and 3, were invalid. The plaintiff also argues the merits of those contentions. The defendant responds that: (1) the trial court was correct in its determination that it lacked jurisdiction; (2) if the trial court was incorrect, the plaintiff's contentions lack merit; and (3) in any event, subsequent legislation, namely, P.A. 97-254, § 1 (b), renders any challenge to the defendant's actions moot by authorizing the defendant to postpone its revaluation until 1999.

We conclude that the court did have subject matter jurisdiction to adjudicate the plaintiff's claims regarding the two additional postponements, as well as the validity of P.A. 95-283, § 8, and P.A. 96-218, §§ 1 and 3. Ordinarily that conclusion would lead us to remand the case

to the trial court to adjudicate those claims in the first instance. In this case, however, we have decided to address those claims because they do not require further fact-finding, they are adequately briefed here, and both the plaintiff and the defendant need to know now what their respective tax obligations and rights are. We conclude that P.A. 97-254 lays to rest any question about the defendant's actions in postponing the revaluation beyond 1994, and that the defendant need not conduct a revaluation until 1999.

The following additional facts and procedural history are relevant to the remainder of our analysis. After the completion of the evidence in this case but before the trial court issued its memorandum of decision on March 10, 1997, the parties, following a status conference with the trial court on October 16, 1996, in early November, 1996, entered into a written supplemental stipulation to the following facts. On December 12, 1995, the common council voted, pursuant to P.A. 95-283, § 8, to postpone for an additional one year period the implementation of the defendant's revaluation for the grand list of October 1, 1995. Accordingly, the defendant adopted its annual budget for the 1996–97 fiscal year based on the October 1, 1995 grand list, using the assessment values established in 1983, and the plaintiff was presented with a tax bill for the October 1, 1995 grand list of $1,122,825. The parties further stipulated that, on August 13, 1996, the common council voted, pursuant to P.A. 96-218, to postpone for an additional one year period the implementation of the revaluation for the grand list of October 1, 1996. In addition, although it was not formally part of the stipulation, it is undisputed that this action of the defendant in 1996 had the effect of continuing, for an additional, fourth fiscal year, the use of the 1983 assessment values.

Furthermore, the parties filed supplemental posttrial briefs addressing the issues of the applicability of P.A.

95-283 and P.A. 96-218 to the 1995 and 1996 grand lists, as well as the issues regarding the constitutionality of those acts, and the defendant filed additional exhibits in connection with those issues. The plaintiff's claims in these supplemental proceedings mirrored its claims regarding the actions of the defendant in 1994, and the effect thereon of Spec. Sess. P.A. 94-4. More specifically, the plaintiff claimed that: (1) nothing in either P.A. 95-283 or P.A. 96-218 authorized the defendant to continue to postpone the revaluation; and (2) application of those acts would deprive the plaintiff of equal protection of the laws.

The trial court, however, specifically declined to address the plaintiff's claims regarding P.A. 95-283 and P.A. 96-218 and the two grand lists in issue, for two reasons. First, the plaintiff had not amended its complaint to include the challenges to the 1995 and 1996 grand lists and P.A. 95-283 and P.A. 96-218. Second, the plaintiff was seeking a declaratory judgment as well as relief under § 12-119. Thus, the court reasoned, although notice had been given pursuant to Practice Book § 390 (d),[19] now Practice Book (1998 Rev.) § 17-55 (4), to all interested parties, namely, all Norwalk taxpayers and the chief executive officers of the other 168 municipalities, with respect to the plaintiff's challenges to the 1994 grand list and Spec. Sess. P.A. 94-4, no such notice had been given with respect to its challenges to the 1995 and 1996 grand lists and P.A. 95-283 and P.A. 96-218. The defendant, although it did not object to the trial court's consideration of the 1995 and 1996 grand lists and P.A. 95-283 and P.A. 96-218, and instead argued in that court against the plaintiff's claims on their merits,

[19] Practice Book § 390, now Practice Book (1998 Rev.) § 17-55 (4), provides in relevant part: "The court will not render declaratory judgments upon the complaint of any person . . .

"(d) until all persons having an interest in the subject matter of the complaint are parties to the action or have reasonable notice thereof."

adopts on appeal the trial court's reasons for declining to address the claims at issue. We disagree with both reasons.

With respect to the lack of an amendment of the complaint, it is true that ordinarily a court may not grant relief on the basis of an unpleaded claim. *Willametz* v. *Guida-Seibert Dairy Co.*, 157 Conn. 295, 302, 254 A.2d 473 (1968) (" '[a] plaintiff may not allege one cause of action and recover upon another' "); *Malone* v. *Steinberg*, 138 Conn. 718, 721, 89 A.2d 213 (1952) (same). That does not necessarily mean, however, that the absence of a particular claim from the pleadings automatically precludes a trial court from addressing the claim, because a court may, despite pleading deficiencies, decide a case on the basis on which it was actually litigated and may, in such an instance, permit the amendment of a complaint, even after the trial, to conform to that actuality. See, e.g., *Saphir* v. *Neustadt*, 177 Conn. 191, 206, 413 A.2d 843 (1979). Indeed, we have recognized that, even in the absence of such an amendment, where the trial court had in fact addressed a technically unpleaded claim that was actually litigated by the parties, it was improper for the Appellate Court to reverse the trial court's judgment for lack of such an amendment. See, e.g., *Tedesco* v. *Stamford*, 215 Conn. 450, 458–63, 576 A.2d 1273 (1990), remanded, 24 Conn. App. 377, 588 A.2d 656 (1991), rev'd, 222 Conn. 233, 610 A.2d 574 (1992). Whether to grant such a post-trial amendment is within the discretion of the trial court. *McLaughlin Ford, Inc.* v. *Ford Motor Co.*, 192 Conn. 558, 564, 473 A.2d 1185 (1984) (" '[t]he trial court has wide discretion in granting or denying amendments before, during, or after trial' "); *Lawson* v. *Godfried*, 181 Conn. 214, 216, 435 A.2d 15 (1980) (same).

In the present case, the only appropriate procedure for the trial court to employ would have been to decide the issues despite the lack of such an amendment, and

to permit the complaint to be amended posttrial so as to conform to the parties' proof. The parties, after a status conference with the court, had entered into a factual stipulation reflecting the issues raised under P.A. 95-283 and P.A. 96-218, had entered exhibits in connection therewith, and had extensively briefed the issues presented. No one would have been surprised or prejudiced by consideration of the issues. Under these circumstances, it was an abuse of discretion for the trial court to decline to adjudicate those issues based on a lack of a formal amendment of the complaint.

The second reason given by the trial court, namely, the lack of notice to interested parties with regard to the 1995 and 1996 grand lists and P.A. 95-283 and P.A. 96-218, poses different considerations. We conclude, nonetheless, that this reason was insufficient to preclude the trial court's consideration of those issues because, apart from the plaintiff's claim for declaratory relief, the plaintiff's nondeclaratory claim for relief under § 12-119 was before the court.

The trial court concluded that it lacked subject matter jurisdiction to consider the plaintiff's request for a declaratory judgment regarding P.A. 95-283 and P.A. 96-218 because, although notice had been given to all Norwalk taxpayers and to the chief executive officers of the other 168 Connecticut municipalities regarding the plaintiff's challenges to Spec. Sess. P.A. 94-4—who presumably were the "interested parties" to whom notice was required to be given pursuant to Practice Book § 390 (d)—no such notice had been given to them regarding the subsequent challenges to P.A. 95-283 and P.A. 96-218. This conclusion was based on the principle, under our declaratory judgment jurisprudence, that the failure to give notice to interested parties under Practice Book § 390 (d) deprives the court of jurisdiction to render a declaratory judgment. See, e.g., *Russo* v. *Watertown*, 184 Conn. 30, 33–35, 441 A.2d 56 (1981); compare

*Serrani* v. *Board of Ethics*, 225 Conn. 305, 309 n.5, 622 A.2d 1009 (1993) (initial failure to give notice only deprives court of jurisdiction to *render* judgment; such failure may be remedied by subsequent notice); *Connecticut Ins. Guaranty Assn.* v. *Raymark Corp.*, 215 Conn. 224, 230, 575 A.2d 693 (1990) (same).[20]

This principle is not dispositive of the claims concerning the 1995 and 1996 grand lists and P.A. 95-283 and P.A. 96-218, however, because in connection with its claim for declaratory relief, the plaintiff concomitantly sought substantive relief as a taxpayer under § 12-119, through which claim for relief all of its claims regarding

---

[20] Recent developments in our subject matter jurisdiction jurisprudence in other areas may cast doubt on the doctrine, however well established, that a failure to give the notice required under Practice Book § 390 (d) is a *subject matter jurisdictional* defect; see, e.g., *Russo* v. *Watertown*, supra, 184 Conn. 33–35; as opposed, for example, to a defect more closely resembling the failure to cite in or give notice to a necessary or indispensable party to litigation, which is not subject matter jurisdictional. See *Fong* v. *Planning & Zoning Board of Appeals*, 212 Conn. 628, 635–36, 563 A.2d 293 (1989). We have indicated that subject matter jurisdiction is, with certain constitutional exceptions not applicable here, a matter of statute, not judicial rule making. See *Simms* v. *Warden*, 229 Conn. 178, 184, 640 A.2d 601 (1994). General Statutes § 52-29 (a) gives the Superior Court subject matter jurisdiction to render declaratory judgments, "whether or not further relief is or could be claimed." Subsection (b) of § 52-29 authorizes the judges to "make such orders and rules as they may deem necessary or advisable" to effectuate subsection (a). Practice Book § 390 (d) is an example of such a rule. It may be questionable that the judges may, pursuant to their rule-making authority under subsection (b) of § 52-29, limit the subject matter jurisdiction created by subsection (a) of § 52-29. See, e.g., General Statutes § 51-14 (a) ("The judges of the Supreme Court, the judges of the Appellate Court, and the judges of the Superior Court shall adopt and promulgate and may from time to time modify or repeal rules and forms regulating pleading, practice and procedure in judicial proceedings in courts in which they have the constitutional authority to make rules, for the purpose of simplifying proceedings in the courts and of promoting the speedy and efficient determination of litigation upon its merits. . . . *Such rules shall not abridge, enlarge or modify any substantive right nor the jurisdiction of any of the courts.* . . ." [Emphasis added.]). We need not decide this question in the present case, however, because of our conclusion that the trial court had jurisdiction to adjudicate the plaintiff's claims under § 12-119.

the 1995 and 1996 grand lists and those acts were validly presented to the trial court. Section 12-119 applies to two types of taxpayer challenges to a town's real property assessment or revaluation. The first, not involved here, applies to "the absolute nontaxability of the property in the municipality where situated . . . ." (Internal quotation marks omitted.) *Wilson* v. *Kelley*, 224 Conn. 110, 118–19, 617 A.2d 433 (1992). The second, which the plaintiff invoked here, "consists of claims that assessments are (a) manifestly excessive and (b) . . . could not have been arrived at except by disregarding the provisions of the statutes for determining the valuation of the property." (Internal quotation marks omitted.) Id., 119. Under this second category of claim, the plaintiff must establish, in addition to a manifestly excessive valuation, that the assessment is illegal. Id. The substantive claims included in the plaintiff's declaratory judgment count—the claims regarding the 1995 and 1996 grand lists, as affecting its property, and regarding the inapplicability and invalidity of P.A. 95-283 and P.A. 96-218 with respect to those two grand lists—were therefore properly raised in the plaintiff's complaint under the § 12-119 count. The concomitant request for declaratory relief did not diminish the propriety of raising those claims in the nondeclaratory portion of its complaint. Indeed, we have made clear that "a declaratory judgment action must rest on some cause of action that would be cognizable in a nondeclaratory suit." *Wilson* v. *Kelley*, supra, 116. Thus, even if we were to assume, without deciding, that the plaintiff was required by Practice Book § 390 (d) to give further notice of its additional claims, any lack of proper notice under that section with respect to the declaratory judgment count did not deprive the court of jurisdiction to consider those claims in the context of the plaintiff's nondeclaratory count. Because the plaintiff was entitled to, and did, raise those claims in its complaint under

§ 12-119, it was improper for the court to decline to consider them.

We acknowledge that in *Cioffoletti* v. *Planning & Zoning Commission*, 209 Conn. 544, 563, 552 A.2d 796 (1989), which involved a challenge to the validity of a decision of the Ridgefield planning and zoning commission and the regulation upon which the decision was based, we stated that certain general challenges to the legality of legislation in which many persons may have an interest may be brought only through a declaratory judgment action, in order to ensure that notice be provided to all interested parties. Id. ("[t]he final constitutional issue, relating to the adequacy of the regulations in setting forth standards for a decision upon an application, constitutes the kind of general attack upon land use regulations that we have indicated should be the subject of a declaratory judgment action rather than an appeal from the denial of an application submitted pursuant to those regulations"); see also *Bombero* v. *Planning & Zoning Commission*, 218 Conn. 737, 745, 591 A.2d 390 (1991) (stating that *Cioffoletti* rule applied where "the plaintiff mounts a general attack on the legislative enactment of a regulation, primarily based on constitutional vagueness grounds, and combines therewith nonconstitutional grounds for the regulation's invalidity"). If the *Cioffoletti* rule were applied in the present case, it effectively would preclude § 12-119 as a vehicle for the plaintiff's claims regarding the validity of the 1995 and 1996 grand lists and P.A. 95-283 and P.A. 96-218.

In our view, however, that rule, which limits the ability of parties to pursue statutory avenues of appeal in regard to municipal or agency legislation, is ill-conceived. First, it has little support in our case law. None of the three cases cited in *Cioffoletti*—*National Transportation Co.* v. *Toquet*, 123 Conn. 468, 478, 196 A. 344 (1937); *Florentine* v. *Darien*, 142 Conn. 415, 428–30,

115 A.2d 328 (1955); and *Russo* v. *Watertown*, supra, 184 Conn. 33–35—lends support to the rule and, in fact, *Toquet* directly undermines it. In *Toquet*, which involved both a declaratory judgment action and a substantive appeal challenging the validity of a municipal zoning regulation, we held that, although the declaratory judgment action could not be maintained because of a failure to provide the requisite notice to the other interested property owners, the plaintiff could pursue its claims through its substantive appeal. *National Transportation Co.* v. *Toquet*, supra, 481–86. *Florentine* merely articulated the complementary principles that: (1) a litigant may not, in the course of a statutory based appeal concerning the actions of a municipality or an agency, challenge the validity of the statute providing the basis for the appeal; but (2) an independent declaratory judgment action challenging that statute could subsequently be brought. *Florentine* v. *Darien*, supra, 428–30. *Florentine* does not, however, suggest that *only* a declaratory judgment action may be maintained when a party to otherwise proper litigation challenges the validity of legislation that is being applied to the party. Similarly, *Russo* contained no suggestion of this requirement. Rather, in that case, the plaintiff's challenge to the municipal legislation at issue *was* a declaratory judgment action. This court's conclusion that the claim could not be maintained because of the plaintiff's failure to provide notice to all interested parties constituted nothing more than an application of the declaratory judgment notice rule. *Russo* v. *Watertown*, supra, 33–35.

In addition, as we acknowledged in *Bombero*, many of our decisions have allowed plaintiffs to pursue challenges to the validity of municipal or agency regulations or other legislation through actions other than declaratory judgment actions, including through statutory appeals. *Bombero* v. *Planning & Zoning Commission*, supra, 218 Conn. 744 (citing, as examples, *Carofano* v.

*Bridgeport,* 196 Conn. 623, 495 A.2d 1011 [1985]; *New Milford* v. *SCA Services of Connecticut, Inc.,* 174 Conn. 146, 384 A.2d 337 [1977]; *Sonn* v. *Planning Commission,* 172 Conn. 156, 374 A.2d 159 [1976]; *Zenga* v. *Zebrowski,* 170 Conn. 55, 364 A.2d 213 [1975]); see also *Rosnick* v. *Zoning Commission,* 172 Conn. 306, 307–308, 374 A.2d 245 (1977) (after concluding that action challenging zoning regulation could not be maintained as declaratory judgment action because of failure to provide proper notice to all interested parties, court treated complaint as appeal from decision of zoning commission). As we acknowledged in *Bombero* v. *Planning & Zoning Commission,* supra, 744, these decisions are difficult to reconcile with the *Cioffoletti* rule. Especially in conjunction with our cases indicating that a declaratory judgment action is inappropriate when a plaintiff has available another speedy remedy that would be as effective, convenient, appropriate and complete as a declaratory judgment action; see Practice Book § 390 (c), now Practice Book (1998 Rev.) § 17-55 (3); see also, e.g., *England* v. *Coventry,* 183 Conn. 362, 365, 439 A.2d 372 (1981); these inconsistencies have left the trial courts and potential litigants in confusion regarding the proper form of action to pursue.

Finally, in our view, the concern for third party interests in the challenged legislation, the protection of which constitutes the rationale for the *Cioffoletti* rule, is outweighed by the importance of honoring the legislature's grant of statutory avenues of appeal with regard to municipal or agency legislation. As we stated in *Toquet,* "[t]here are many instances in which a party is entitled to relief at law, even though the proceedings he brings may result in the establishment of a rule which will directly affect the interests of others not parties to the action." *National Transportation Co.* v. *Toquet,* supra, 123 Conn. 481. Indeed, every decision that substantively affects the shape of the law inevitably impacts

upon the interests of third persons. In general, however, notice to such persons is not required, not only because such a requirement would be unduly burdensome, but also because their interests are adequately represented by a defendant and by a plaintiff with proper standing. In our view, in challenges to the validity of municipal or agency legislation, the interests of the municipality or agency in upholding its legislation provide sufficient protection to the interests of third parties in that legislation and, therefore, it is not necessary to require that such challenges be brought as declaratory judgment actions. See id., 482 ("at least in so far as relief to the plaintiff is concerned, the municipality, made a party to the action, represents the residents and property owners within its boundaries"). Therefore, we abandon the *Cioffoletti* rule requiring that general attacks on the validity of legislation be brought in the form of declaratory judgment actions instead of substantive appeals.

We turn, therefore, to the merits of the plaintiff's claims regarding the 1995 and 1996 grand lists. The plaintiff contends that the postponement of the revaluation by the defendant on those grand lists "was not statutorily permitted or constitutionally valid." The plaintiff's constitutional claims are the same as those raised with respect to the 1994 grand list, and are without merit for the same reasons we gave regarding that grand list.

With respect to the plaintiff's statutory claims, the plaintiff first argues that if Spec. Sess. P.A. 94-4, § 51, was invalidly applied to it, "Norwalk cannot rely on either of the subsequent statutory amendments in 1995 and 1996 to further postpone revaluation." We already have rejected, however, the plaintiff's challenges to

Spec. Sess. P.A. 94-4 and the defendant's conduct thereunder.[21]

The plaintiff next argues that P.A. 95-283, § 8, and P.A. 96-218, §§ 1 and 3, provided no valid statutory authority for the postponements of the revaluation on the 1995 and 1996 grand lists. We need not address the effect of P.A. 96-218, however, because we agree with the defendant that P.A. 97-254, § 1 (b) (1), expressly permits the defendant to postpone its revaluation until 1999, rendering moot any issues regarding P.A. 95-283 and P.A. 96-218. In P.A. 97-254, the legislature again addressed the ongoing issue of municipal revaluations that had occupied its attention since 1994. In subsection (b) (1) of P.A. 97-254, § 1, the legislature provided that: "The assessor or board of assessors of each town shall revalue all of the real estate in their respective municipalities in accordance with the schedule provided in this section. Nothing in this subsection shall be construed to prohibit a town from effecting more frequent revaluations between the implementation of each revaluation required in accordance with the provisions of this section. . . ." There then followed a three column table. The first column was titled "Town/City"; the second column was titled "Year of Next Revaluation"; and the third column was titled "Year of Subsequent Revaluation." For Norwalk, the year of the next revaluation was 1999, and the year of subsequent revaluation was 2003. It is clear from the language of P.A. 97-254, § 1 (b) (1), which is consistent with its legislative history; see Conn. Joint Standing Committee Hearings, Finance, Revenue and Bonding, Pt. 3, 1997 Sess., pp. 799–800, 824–25, 908–909, 978, 1020, 1025–26; 40 S. Proc., Pt. 6, 1997 Sess., p. 1849; 40 S. Proc., Pt. 12, 1997 Sess., pp. 4014–16, 4037–38; 40 H.R. Proc., Pt. 18, 1997 Sess., pp.

---

[21] We need not address the plaintiff's contentions regarding P.A. 95-283 because of our conclusion that the subsequent legislation, P.A. 97-254, controls.

6755–61; that the defendant may continue to postpone its revaluation until 1999. The plaintiff's challenge to the defendant's postponement of the revaluation must, therefore, fail.

The judgment is affirmed as to the 1994 postponement of the revaluation; the judgment declining to consider the 1995 and 1996 postponements of the revaluation is reversed and the case is remanded with direction to render judgment for the defendant regarding the 1995 and 1996 postponements of the revaluation by the defendant.

In this opinion NORCOTT, KATZ, PALMER and O'CONNELL, Js., concurred.

BERDON, J., with whom MCDONALD, J, joins, dissenting. The majority would have us believe that the law allows the defendant city of Norwalk (Norwalk), to ignore the statutes of Connecticut and the constitution of the United States in order to give a tax break to the residential property owners of the city at the expense of the industrial and commercial (industrial) property owners and the residential condominium (condominium) property owners. As a result of Norwalk's decision to retain the 1983 real property valuations for establishing the grand lists of 1993, 1994, 1995 and 1996, industrial and condominium property is now assessed at a rate substantially greater than residential property, and as a result, owners of these properties must pay excessive taxes.

The majority's analysis of Norwalk's decision to stay implementation of its 1993 revaluation, based upon whether Norwalk constitutionally could impose different tax burdens on different classes of property, is irrelevant for this case. Instead, we must determine whether Norwalk's decision to pursue a policy that has systematically undervalued residential property and overvalued industrial and condominium properties, denies the

plaintiff GTE Realty Corporation,[1] an industrial property owner, of its right to equal protection of the laws when state law requires that all real estate—residential, industrial and condominium properties—be treated as one class and assessed at 70 percent of true and actual value. See, e.g., *Hillsborough* v. *Cromwell*, 326 U.S. 620, 623, 66 S. Ct. 445, 90 L. Ed. 358 (1946) ("equal protection clause . . . protects the individual from state action which selects him out for discriminatory treatment by subjecting him to taxes not imposed on others of the same class"); *Charleston Federal Savings & Loan Assn.* v. *Alderson*, 324 U.S. 182, 190, 65 S. Ct. 624, 89 L. Ed. 857 (1945) (equal protection clause "applies . . . to taxation which in fact bears unequally on persons or property of the same class"); *Weissinger* v. *Boswell*, 330 F. Sup. 615, 622 (M.D. Ala. 1971) ("any substantial disparity or differences in taxation resulting from the failure of state officers to properly administer the state's tax laws will offend the Due Process and Equal Protection Clauses of the Fourteenth Amendment").

I begin by setting forth succinctly the undisputed facts concerning Norwalk's decision to postpone implementation of its 1993 revaluation.

1. Norwalk's last decennial revaluation was in 1983. Accordingly, a decennial revaluation for the 1993 grand list was due in accordance with General Statutes (Rev. to 1993) § 12-62.[2]

2. Norwalk conducted and completed a physical revaluation of all property in 1993 with the intent to

---

[1] See footnote 2 of the majority opinion.

[2] General Statutes (Rev. to 1993) § 12-62 (a) provides in relevant part: "[T]he assessors of all . . . cities . . . *shall, no later than ten years following the effective date of the last preceding revaluation* of all real property and every ten years thereafter, revalue all of the real estate in their respective municipalities for assessment purposes . . . ." (Emphasis added.)

General Statutes (Rev. to 1993) § 12-62 (d) further provides in relevant part: "The assessments derived from such revaluation *shall be used for the*

establish a new grand list as of October, 1993, based upon the assessment of all property at 70 percent of its true and actual value. Norwalk then notified taxpayers of their new assessments, and made available to the public the revaluation assessment data and the assessors who performed the revaluation.[3]

3. The board of tax review conducted hearings on appeals of the 1993 revaluation, and, contrary to the claim of the majority, rendered decisions thereon; thereafter, numerous appeals were taken to the Superior Court. The plaintiff appealed its new assessment to the board of tax review; that appeal was denied and the plaintiff appealed to the Superior Court. That appeal is now pending.

4. At the March 8, 1994 meeting of the Norwalk common council (common council) Mayor Frank Esposito requested and was granted authorization to seek a deferment of the implementation of the 1993 property revaluation from the state office of policy and management for a period not to exceed three years. By letter dated March 16, 1994, the board of tax review applied to the office of policy and management for a one year extension. The office of policy and management is authorized by General Statutes (1993) § 12-117[4] to extend the period of time prescribed by law for the completion of the decennial revaluation for a period not exceeding two months. The office of policy and management granted Norwalk a two month extension that expired on May 31, 1994.[5]

_purpose of levying property taxes_ in such municipality in the assessment year in which such revaluation becomes effective. . . ." (Emphasis added.)

[3] Approximately 1800 taxpayers met with the assessors to review their assessments based on the 1993 property revaluation.

[4] See footnote 12 of the majority opinion for the text of General Statutes (Rev. to 1993) § 12-117.

[5] Subsequent to the March, 1994 request, by letter dated May 17, 1994, Norwalk's mayor and the board of tax review sought an extension of an additional year, which the office of policy and management did not grant.

5. The Norwalk charter requires the board of estimate and taxation, on the first Monday of April (here, April 4, 1994), to establish the final budget, and to adopt a mill rate based upon the grand list.

6. On April 4, 1994, the board of estimate and taxation established a final budget, and, without any authority, established a mill rate based on the October 1, 1983 valuations. This action was taken by the board of estimate and taxation, notwithstanding the fact that all the real property was reevaluated to reflect 1993 valuations, assessments were made on that basis, property owners were given official notices of their assessment and more than 1800 owners challenged those assessments.

7. On or about June 1, 1994, while the plaintiff's appeal was pending, Norwalk issued the tax bills based upon 1983 property values.

8. On June 9, 1994, the legislature enacted, in the May, 1994 special session, No. 94-4, § 51, of the Public Acts (Spec. Sess. P.A. 94-4),[6] which provides that the legislative body of a municipality *may* stay implementation of a decennial revaluation for up to two years. That act, which was codified as General Statutes (Rev. to 1995) § 12-62h, more specifically provides in part that "[a]ny municipality required to implement revaluation for the assessment year commencing October 1, 1993, which has not as of February 15, 1994, adopted mill rates for taxes due July 1, 1994, may use such municipality's most recently completed grand list prior to revaluation as updated by any additions, deletions, splits, combinations and other changes in ownership as of October 1, 1993" in order to implement the recommendations of the property tax reform commission (reform commission).

---

[6] See footnote 4 of the majority opinion for the text of Spec. Sess. P.A. 94-4, § 51.

9. On June 28, 1994, the common council suspended its rules and, purporting to act pursuant to Spec. Sess. P.A. 94-4, adopted a motion authorizing a stay of implementation for Norwalk's 1993 decennial revaluation for a period not to exceed two years.

10. On December 27, 1994, the common council narrowly passed a motion to ratify the stay of the 1993 revaluation until July 1, 1996, by a vote of seven to six.

11. Pursuant to No. 95-283, § 8, of the 1995 Public Acts (P.A. 95-283),[7] and No. 96-218, §§ 1 and 3, of the 1996 Public Acts (P.A. 96-218),[8] the legislature amended Spec. Sess. P.A. 94-4 so as to enable the legislative body of a municipality to extend the stay of implementation of the decennial revaluation beyond that provided for in Spec. Sess. P.A. 94-4, and to enable municipalities to continue to use their most recently completed grand list prior to revaluation. As a result of these amendments, Norwalk, through successive votes by the common council, has stayed revaluation until October 1, 1997.[9]

I

Because Norwalk effectively adopted a tax based upon the 1993 revaluation on April 4, 1994, Spec. Sess. P.A. 94-4 does not apply to this appeal. As of April 4, 1994, the date Norwalk was required under its charter to establish the final 1994–95 budget and to adopt a mill rate based on the 1993 revaluation, it had taken all the necessary action to implement the decennial revaluation except making the ministerial calculation of establishing the mill rate based upon the 1993 revaluation.

---

[7] See footnote 7 of the majority opinion for the text of P.A. 95-283, § 8.

[8] See footnote 8 of the majority opinion for the text of P.A. 96-218, §§ 1 and 3.

[9] The record indicates that the parties stipulated to the facts concerning the postponement of implementation in 1995 and 1996.

First, Norwalk conducted a physical revaluation of all real estate based upon *1993 values* and established a proposed 1993 grand list on the basis of this revaluation. Second, in the fall of 1993, Norwalk sent revaluation notices to all the property owners. Third, Norwalk's director of finance, Jack E. Miller, submitted the proposed operation budget, which was based upon the 1993 revaluation, to the board of estimate and taxation at its January 24, 1994 meeting. Fourth, the appraisers held informal review sessions with property owners in order to make voluntary adjustments. Fifth, the board of tax review conducted hearings on appeals by individual property owners, all of which were based, not upon the 1983 revaluation, but on the 1993 revaluation; some appeals were taken to the Superior Court by individual owners. Sixth, Norwalk notified property owners by mail on February 10, 1994, that the current mill rate for the 1992 grand list would not be used to determine their July, 1994 tax bills, but, rather, Norwalk would adopt a reduced mill rate.

Consequently, all that Norwalk had to do in order to complete implementation of the 1993 revaluation at the April 4, 1994 meeting of the board of estimate and taxation was to establish the final budget, which it did, and complete the ministerial task of calculating the mill rate based upon the 1993 revaluation. "The word 'ministerial' under our law refers to a duty which is to be performed by an official 'in a given state of facts, in a prescribed manner . . . without regard to or the exercise of his own judgment [or discretion] upon the propriety of the act being done.' " *Pluhowsky* v. *New Haven*, 151 Conn. 337, 347, 197 A.2d 645 (1964). This court made it clear, as early as 1925, that "officers whose duty it is to value and assess property may be compelled by mandamus to proceed in the discharge of their duties . . . ." (Internal quotation marks omitted.) *Foote* v. *Bartholomew*, 103 Conn. 607, 615, 132 A. 30

(1925). Indeed, the Norwalk charter and the statute that existed on April 4, 1994, the date the board of estimate and taxation set the mill rate, General Statutes (Rev. to 1993) § 12-62, imposed a duty on Norwalk officials to complete the revaluation process—by using the assessments derived from the 1993 revaluation "for the purpose of levying taxes"—in a prescribed manner, without regard to their own judgments. *Chamber of Commerce of Greater Waterbury, Inc.* v. *Murphy*, 179 Conn. 712, 719–20, 427 A. 2d 866 (1980).

Instead of performing this ministerial act, the board of estimate and taxation, on April 4, 1994, without authority and contrary to law, established the mill rate based upon the 1983 revaluation, and caused tax bills to be sent to the property owners with the mill rate applied to the 1983 values. Indeed, that was done without the approval of the common council, Norwalk's legislative body. It is contrary to our rule of law to allow Norwalk, after it blatantly ignored General Statutes §§ 12-62a (b) and 12-63[10] by favoring one group of taxpayers at the expense of others, to take advantage of Spec. Sess. P.A. 94-4. Rather, as a matter of law, we must consider that Norwalk, on April 4, 1994, effectively adopted its property tax based on 1993 real estate values, and, consequently, that Spec. Sess. P.A. 94-4 does not apply.

II

A

Even if Spec. Sess. P.A. 94-4 is applicable, I conclude that Norwalk's election to implement it for the purpose

---

[10] General Statutes § 12-62a (b) provides in part: "Each such municipality shall . . . assess all property for purposes of the local property tax at a uniform rate of seventy per cent of present true and actual value, as determined under section 12-63."

General Statutes § 12-63 provides in part: "The present true and actual value . . . shall be deemed by all assessors and boards of assessment

of continuing the disparity in assessed values of industrial, condominium and residential properties—properties that our legislature has mandated be assessed at a uniform rate—violates the equal protection rights of the plaintiff and other industrial and condominium property owners.

The majority argues that the plaintiff cannot prove Norwalk's implementation of Spec. Sess. P.A. 94-4 violates its right to equal protection of the laws unless it makes an "explicit demonstration" that Norwalk's decision to postpone implementation of the 1993 revaluation "is a hostile and oppressive discrimination against particular persons and classes." The majority's conclusion, however, is contrary to clear United States Supreme Court precedent. First, the law is clear that even though Spec. Sess. P.A. 94-4 is valid on its face, the plaintiff may prove that Norwalk's implementation of the act violates its equal protection rights by showing that (1) the implementation results in unequal treatment for "those who are entitled to be treated alike [and (2)] there is shown to be present in [Norwalk's stay of implementation] an element of intentional or *purposeful discrimination*." (Emphasis added.) *Snowden* v. *Hughes*, 321 U.S. 1, 8, 64 S. Ct. 397, 88 L. Ed. 497 (1944). Second, the United States Supreme Court has held that *purposeful discrimination in tax cases* "may be evidenced . . . by a systematic under-valuation of the property of some taxpayers and a systematic over-valuation of the property of others, so that the practical effect of the official breach of law is the same as though the discrimination were incorporated in and proclaimed by the statute." Id., 9; *Allegheny Pittsburgh Coal Co.* v. *County Commission of Webster County, West Virginia*, 488 U.S. 336, 346, 109 S. Ct. 633, 102 L. Ed. 2d 688 (1989) ("[t]he relative undervaluation of comparable property

appeals to be the fair market value thereof and not its value at a forced or auction sale."

. . . over time therefore denies petitioners the equal protection of the law"); see also *Long Island Lighting Co.* v. *Brookhaven*, 889 F.2d 428, 432 (2d Cir. 1989) ("requisite unlawful intent [to discriminate] follows from proof of a systematic overassessment over time of certain properties as compared to other similarly situated properties within the taxing district").

The plaintiff is *entitled to be treated* like all other property owners by Norwalk's mayor, common council and board of estimate and taxation with respect to the assessment of its real property. Without exception, the legislature has mandated as our law and public policy that the towns and municipalities tax all real estate—whether it be residential, industrial or condominium property—on the same basis. General Statutes § 12-62a (b) provides in relevant part that the city "shall . . . assess all property for purposes of the local property tax at a uniform rate of seventy per cent of *present true and actual value* as determined under section 12-63." (Emphasis added.) General Statutes (Rev. to 1993) § 12-63 provides in relevant part that the "present true and actual value . . . shall be deemed by all assessors and boards of assessment appeals to be the *fair market value* thereof . . . ." (Emphasis added.) Prior to the enactment of Spec. Sess. P.A. 94-4, General Statutes (Rev. to 1993) § 12-62 provided that all towns and municipalities reassess their taxable property every ten years. Although Spec. Sess. P.A. 94-4 authorized Norwalk to stay implementation of the 1993 revaluation, and thus waived the requirement of § 12-62, it did not require it to do so, nor did it relieve Norwalk of the constitutional requirement of seasonably attaining "a rough equality in the tax treatment of similarly situated property owners." *Allegheny Pittsburgh Coal Co.* v. *County Commission of Webster County, West Virginia,* supra, 488 U.S. 343. Finally, there is no statutory authority in Connecticut authorizing individual municipalities

to fashion their own substantive assessment policies independently of state statute.

Norwalk's stay of implementation for four years resulted in *unequal treatment* of the plaintiff and other industrial and condominium property owners. Simply put, as a result of Norwalk's stay of the 1993 revaluation, industrial and condominium properties have been assessed at a substantially higher percentage of fair market value than has residential property in Norwalk. For example, if the 1993 revaluation, based upon the then current fair market values for all property in Norwalk, had been put into effect in 1994, condominium property owners would have paid 12.25 percent less in taxes, industrial property owners would have paid 7.74 percent less, and residential property owners would have paid 15.4 percent more. Indeed, as a result of Norwalk's postponement of the implementation of the 1993 revaluation, the plaintiff's tax bill on the 1993 grand list increased by $432,648.16, or 39 percent more than what it would have been had the 1993 revaluation been implemented. During the pendency of this case, Norwalk, acting pursuant to P.A. 95-283 and P.A. 96-218, postponed revaluation for two more years—for a total of four years from the grand list of October 1, 1993 to October 1, 1997. During that time period, the plaintiff and other similarly situated property owners have been significantly impacted by the delay in revaluation.[11]

This lack of uniformity in tax assessments of real property has resulted, not from "mere mistake or error in judgment of tax officials"; *Charleston Federal Savings & Loan Assn.* v. *Alderson,* supra, 324 U.S. 190; but from *Norwalk's intentional decision to systematically discriminate* against industrial and condominium property owners and in favor of residential property owners.

---

[11] According to the plaintiff, the impact of the delay on its property taxes is nearly five times greater than that suffered by other property owners in Norwalk.

The members of Norwalk's finance committee were well informed of the obvious adverse impact on residential property owners of immediate implementation of the 1993 revaluation, and the obvious adverse impact on industrial and condominium property owners of staying implementation of the 1993 revaluation. Indeed, in a memorandum dated December 1, 1994, Miller, Norwalk's finance director, explained to the finance committee that "[t]he State requirement that municipalities must revalue all real property not less than every ten years has caught us in an economic cycle where commercial property values have lagged against residential property appreciation. Thus, if revaluation is implemented in this cycle, the unavoidable result is that residential property assessments will comprise a greater proportion of the Grand List of all assessable property and consequently bear a greater proportion of taxes. This *unfortunate result*, from the viewpoint of most residential property owners, is further aggravated because personal property owned principally by commercial businesses will also drop significantly as a component of the taxable Grand List and *push even more of the tax burden onto residential property owners.*" (Emphasis added.)[12]

Furthermore, the minutes of the December 27, 1994 meeting of the common council, at which the council was asked to "clarify its intent" regarding its prior action staying implementation of the 1993 revaluation, indicate that Norwalk's *sole purpose* had been to favor

---

[12] Moreover, Miller specifically outlined, in dollar terms, how each group of taxpayers would be affected by the implementation of the 1993 revaluation. "If the revaluation had been implemented in the current year, FY 1994–95, the tax levy on commercial real property would have dropped by $3,114,776, the personal property tax levy would have dropped by $5,368,943 and the levy on residential condominium property would have dropped by $1,778,055 and the levy on one, two and three family residen[ces] would have increased by $10,261,774 to make up the reductions in all the other categories."

the residential property owners at the expense of all other property owners. Council member John Lombardi, who moved that the council continue the stay of implementation until July 1, 1996, argued that "immediate implementation of revaluation would be a disservice to the majority of Norwalkers . . . ." Council member Douglas E. Hempstead, who opposed Lombardi's motion and offered his own motion to phase in revaluation over a three year period, argued "that it was unfair to shift the burden to 20–30% of taxpayers to avoid [paying higher taxes]." Another council member, Stephen J. Orris, in concurrence with Hempstead, stated that he thought that 40 percent of Norwalk's taxpayers were carrying the burden of the new taxation for all other taxpayers. Mayor Esposito concluded discussion on Lombardi's motion by stating that "there were many . . . [persons] on fixed incomes . . . [and that] the Council had to consider the 'big picture' [when it considered whether to postpone implementation of the revaluation because] . . . many [persons] could not afford any increase at all."[13]

Moreover, the historical background of Norwalk's attempt to stay implementation of the 1993 revaluation, by departing from normal procedures set out in its own charter and our statutes, demonstrates that Norwalk intended to benefit residential property owners at the expense of industrial and condominium property owners. The trial court found that "nothing in the city charter or in any other statute" authorized Norwalk's mayor to attempt unilaterally to stay implementation of the 1993 revaluation in March, 1994, and that "such action was manifestly inconsistent with General Statutes § 12-117 by which the legislature had conferred *sole* authority to delay implementation of a revaluation on the secretary of the office of policy and management."

---

[13] The motion to stay implementation of the 1993 revaluation passed by a vote of seven to six.

(Emphasis in original.) Indeed, the board of estimate and taxation, without any statutory authorization, established the 1993 grand list and mill rate based on the 1983 revaluation.

Finally, Norwalk conceded, in its brief and at oral argument, that the revaluation was postponed because it would have had an adverse impact on residential property owners.

In light of all the foregoing evidence, I have no doubt that Norwalk intentionally undervalued residential property at the expense of overvalued industrial and condominium property.[14]

B

The majority, relying on *United Illuminating Co.* v. *New Haven,* 179 Conn. 627, 427 A.2d 830, appeal dismissed, 449 U.S. 801, 101 S. Ct. 45, 66 L. Ed. 2d 5 (1980), suggests that even if Norwalk acted intentionally and systematically to protect residential property owners from the effects of the 1993 revaluation, that would not necessarily be unconstitutional because "[t]he government may, without violating the equal protection clause, impose different tax burdens on different classes of property." I agree with the majority. "A State [without violating the equal protection clause] may divide different kinds of property into classes and assign to each class a different tax burden so long as those divisions and burdens are reasonable. . . . It might,

[14] I find unpersuasive the majority's argument that there was no discriminatory intent on the part of Norwalk because its decision to stay the decennial revaluation of real property was not enacted to burden industrial and condominium property owners, but to alleviate the tax burden on single-family homeowners. I agree with the United States Supreme Court that "[t]his is a distinction without a difference . . . ." *Metropolitan Life Ins. Co.* v. *Ward,* 470 U.S. 869, 882, 105 S. Ct. 1676, 84 L. Ed. 2d 751 (1985). "If we were to accept [the majority's] justification, we would have little occasion ever to find a statute unconstitutionally discriminatory." *Bacchus Imports, Ltd.* v. *Dias,* 468 U.S. 263, 273, 104 S. Ct. 3049, 82 L. Ed. 2d 200 (1984).

for example, decide to tax property held by corporations, including petitioners, at a different rate than property held by individuals." (Citation omitted.) *Allegheny Pittsburgh Coal Co.* v. *County Commission of Webster County, West Virginia,* supra, 488 U.S. 344; see also *United Illuminating Co.* v. *New Haven,* supra, 627. I disagree, however, with the majority's contention that Norwalk's decision to stay implementation of the 1993 revaluation for the benefit of residential property owners and to the detriment of industrial and condominium property owners can be justified as a legislative classification.

The majority relies on *United Illuminating Co.* for support of its contention that Norwalk's stay of implementation is actually a tax classification scheme. The statute in question in that case, General Statutes (Rev. to 1979) § 12-62a (e),[15] authorized municipalities whose total real property assessments increased after revaluation by at least 30 percent over the prior year's assessment to phase in the assessment of realty with an

---

[15] General Statutes (Rev. to 1979) § 12-62a provides in relevant part: "Uniform assessment date and rate. Exception to uniform rate in year of revaluation. Deferment of increase in assessed value allowed. . . . (e) Any such municipality may, with respect to the assessment list in such municipality in a year in which a revaluation becomes effective, as required under section 12-62, provided such revaluation has resulted in an increase in the total assessed value of all real property on the assessment list in the year immediately preceding such revaluation of no less than thirty per cent of such total assessed value, commencing with any such assessment list for 1977, by vote of its legislative body and in the manner provided in this subsection, defer all or any part of the amount of such increase in the assessed value of real property included in the assessment list in the year such revaluation becomes effective, provided in the year such revaluation becomes effective and in any succeeding year in which such deferment is allowed by such municipality, the assessed value of such real property in the year immediately preceding revaluation shall be increased in such equal amounts in each of such years that the assessed value of such real property in the last year of such deferment, but in no event later than the fourth year following the year of such revaluation, shall be no less than the assessed value applicable to such property in the year of revaluation except for deferment of such increased assessment in accordance with this subsection."

increased assessment in *equal* amounts over a period not to exceed five years. *United Illuminating Co.* v. *New Haven*, supra, 179 Conn. 631–32. In the present case, the legislature did not classify properties in groups, as was the case in *United Illuminating Co.*, in order to allow orderly implementation of tax revaluation. Rather, the legislature authorized, but did not mandate, municipalities to stay implementation of revaluation "in order to implement the recommendations of the [reform commission] enacted during the 1995 session of the general assembly." Spec. Sess. 94-4, § 51. There is no language in Spec. Sess. P.A. 94-4 that, even remotely, can be construed as authorizing a legislative classification that would allow Norwalk to tax industrial and condominium properties at a higher rate than residential property. Contrary to the stated purpose of Spec. Sess. P.A. 94-4, and the clear mandate of § 12-62a (b), Norwalk utilized Spec. Sess. P.A. 94-4 for the purpose of discriminating against industrial and condominium property owners.

Our analysis of the present case is more properly informed by a review of the United States Supreme Court's decision in *Allegheny Pittsburgh Coal Co.* v. *County Commission of Webster County, West Virginia*, supra, 488 U.S. 336, evaluating the constitutionality of Webster County, West Virginia's method of assessing recently acquired property on the basis of the consideration recited in the deed, while increasing the assessed values of the remaining properties at a much lower rate. In that case, the court noted that Webster County's assessment method resulted in gross disparities in the assessed value of generally comparable property, and was in violation of West Virginia's constitutional provision[16] that "taxation shall be equal and uniform throughout the State, and all property, both real and personal, shall be taxed in proportion to its value . . . ." (Internal

---

[16] W. Va. Const., art. X, § 1.

quotation marks omitted.) Id., 338. The court further noted that, even though states possess broad powers to classify property for tax purposes, no state statute authorized the Webster County tax assessor to impose unequal tax burdens on property owners. Id.

Similarly, Norwalk has followed a system of tax assessment—a stay of the statutorily mandated revaluation—that fails to account for the marked changes in market values for residential, industrial and condominium properties since the 1983 revaluation. Moreover, Norwalk's decision to postpone implementation of the 1993 revaluation for four years and to continue to undervalue residential property and overvalue industrial and condominium property, is contrary to state law, which requires all property to be assessed on the same basis. Furthermore, there is no indication that our legislature, from whom all local taxing authority is derived; *Burwell* v. *Board of Selectmen*, 178 Conn. 509, 517, 423 A.2d 156 (1979); sanctioned Norwalk's intentional violation of §§ 12-62a and 12-63 by enacting Spec. Sess. P.A. 94-4, or any subsequent tax reform statute.

The relevance of *Allegheny Pittsburgh Coal Co.* to this appeal is highlighted by the United States Supreme Court's decision in *Nordlinger* v. *Hahn*, 505 U.S. 1, 112 S. Ct. 2326, 120 L. Ed. 2d 1 (1992), upholding California's adoption of a tax assessment method,[17] analogous to the method employed by the Webster County tax assessor, that resulted in great disparities in tax treatment for owners of comparable properties. The Supreme Court held that California's system of assessing newly

---

[17] California adopted, as article XIIIA of its constitution, popularly known as Proposition 13, a tax assessment policy that requires tax assessors to assess newly purchased real estate sold after the effective date of the amendment at its full value, while assessing older properties at a different rate. Proposition 13 capped real property taxes at 1 percent of a property's "full cash value," and placed a 2 percent cap on annual increases in assessed valuations. *Nordlinger* v. *Hahn*, supra, 505 U.S. 5.

purchased real property at its full value, while assessing older properties at a different rate, did not violate the equal protection clause because this difference in tax treatment rationally furthered California's legitimate interest in preserving local neighborhoods and protecting existing property owners' reliance interests. Id., 13. The *Nordlinger* court distinguished the ruling in *Allegheny Pittsburgh Coal Co.* on the basis of two factors: (1) there was no conceivable indication that the "policies underlying an acquisition-value taxation scheme could conceivably have been the purpose for the Webster County tax assessor's unequal assessment scheme," and (2) unlike California, West Virginia's constitution and statutes did not sanction such discrimination. Id., 14–15.

Likewise, there is no conceivable indication that any purpose, other than Norwalk's desire to "alleviate the [tax] burden on single-family homeowners," at the expense of property owners of the same class, underlay Norwalk's decision to stay implementation of the 1993 revaluation for four years. Nor is there any statutory sanction to justify Norwalk's discriminatory policy.

Professor Laurence H. Tribe reminds us that the "Madisonian ideal of law as the expression of a general public good stands in sharp opposition to the pluralist notion that law aspires merely to satisfy the preferences of ad hoc interest groups." L. Tribe, American Constitutional Law (2d Ed. 1988) § 16-5, p. 1451. By failing to enforce the plaintiff's constitutional right of equal protection, the majority encourages town officials to ignore this ideal of law.

I would reverse the trial court and remand the case with direction that the trial court enter an interlocutory judgment that the actions of Norwalk's common council on June 28, 1994, and December 27, 1994, be declared

null and void with respect to staying the 1993 revaluation, and that the trial court, after allowing the parties to be fully heard, determine the remedy required by law and equity.

Accordingly, I dissent.