[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 STATEMENT OF APPEAL
The plaintiff, Kristine Pinchbeck, appeals from the decision of the defendant, the Guilford planning and zoning commission, approving a (second) coastal area management site plan application submitted by the defendants, Gary and Linda Friedlaender.
 BACKGROUND
The Friedlaenders previously had submitted a coastal area management site plan application (CAM I), to the Guilford planning and zoning CT Page 7241 commission seeking to add two stories to their residence. (11/16/98 Appeal, ¶ 4.) The commission approved that application and Pinchbeck appealed that decision to the Superior Court. The court, Burns, J., dismissed Pinchbeck's appeal. See Pinchbeck v. Planning and ZoningCommission, Superior Court, judicial district of New Haven at New Haven, Docket No. 408265, (March 11, 1999, Burns, J.).[1] On October 9, 1997, however, prior to the court's decision, Guilford's engineering department rescinded its original approval of the Friedlaenders' septic system; (Return of Record [ROR], Item 006); and the Friedlaenders submitted a revised CAM application (CAM II), to the commission on August 28, 1998. (ROR, Item 001.) The commission conducted a public hearing on CAM II on October 7, 1998; (ROR, Items 029; 033; 036); which was continued to October 21, 1998. (ROR, Items 033; 036.) Following the close of the October 21, 1998 public hearing, a vote on a proposed motion for approval of CAM II was taken, which resulted in a tie vote of 3-3-1. (ROR, Item 034, p. 16.) There was confusion, however, among the commissioners as to the effect of that vote. (ROR, Item 034, pp. 16, 17.) A vote was taken to "table this agenda item" to the November 4, 1998 meeting. (ROR, Item 034, p. 17.)
At the November 4, 1998 meeting, the commission voted on another motion to approve, and voted to approve CAM II, with conditions, by a vote of 5-2. (ROR, Item 035, pp. 16-17.) Pinchbeck now appeals from the commission's approval of the Friedlaenders' CAM II.
 JURISDICTION
General Statutes § 8-8 governs an appeal from the decision of a planning and zoning commission to the superior court. "A statutory right to appeal may be taken advantage of only by strict compliance with the statutory provisions by which it is created." (Internal quotation marks omitted.) Bridgeport Bowl-O-Rama v. Zoning Board ofAppeals, 195 Conn. 276, 283, 487 A.2d 559 (1985).
Aggrievement
"[P]leading and proof of aggrievement are prerequisites to the trial court's jurisdiction over the subject matter of a plaintiffs appeal." Jolly, Inc. v. Zoning Board of Appeals, 237 Conn. 184, 192,676 A.2d 831 (1996). General Statutes § 8-8 (a)(1) provides, in part, "`aggrieved person' includes any person owning land that abuts . . . any portion of the land involved in the decision of the board."
In the present appeal, Pinchbeck alleges that she is statutorily aggrieved because she owns land abutting the Friedlaenders' property, and that she is further aggrieved because the project will adversely CT Page 7242 affect her view, her coastal resources, her septic system and her property value. (11/16/98 Appeal, ¶ 16.)
The court, Burns, J., previously found Pinchbeck aggrieved as an abutting landowner at the time of the previous appeal. See Pinchbeckv. Guilford Planning Zoning, supra, Superior Court, Docket No. 408265.
Timeliness and Service of Process
General Statutes § 8-8 (b) provides, in part, that an "appeal shall be commenced by service of process in accordance with subsections (e) and (f) of this section within fifteen days from the date that notice of the decision was published as required by the general statutes." Subsection (e) further provides that service "shall be made by leaving a true and attested copy of the process with, or at the usual place of abode of, the chairman or clerk of the board, and by leaving a true and attested copy with the clerk of the municipality."
The record contains an affidavit of publication, attesting that notice of the commission's decision was published on November 11, 1998 in the Shoreline Guilford newspaper. (Supplemental ROR, Affidavit of Publication). On November 21, 1998, this appeal was commenced by service of process on the chairman of the planning and zoning commission, and on the Friedlaenders. On November 23, 1998, the appeal was served on the Guilford town clerk. Accordingly, the court finds that this appeal was commenced in a timely manner by service of process upon the proper parties.
 SCOPE OF REVIEW
"The power of the commission to require that [an applicant] file a coastal site plan and impose conditions on its approval is derived from the Coastal Management Act . . . General Statutes §§ 22a-90 through22a-112. The act delegates the administration of the state-wide policy of planned coastal development to local agencies charged with responsibility for zoning and planning decisions. See General Statutes §§ 22a-105,22a-106. The act envisages a single review process, during which proposals for development within the coastal boundary will simultaneously be reviewed for compliance with local zoning requirements and for consistency with the policies of planned coastal management." (Internal quotation marks omitted.) DeBeradinis v. Zoning Commission, 228 Conn. 187, 195-96,635 A.2d 1220 (1994).
"With respect to review of a coastal site plan, [p]roceedings before planning and zoning commissions are classified as administrative. . . . Conclusions reached by the commission must be upheld by the trial court CT Page 7243 if they are reasonably supported by the record. The credibility of the witnesses and the determination of issues of fact are matters solely within the province of the agency. The question is not whether the trial court would have reached the same conclusion, but whether the record before the agency supports the decision reached. . . . The action of the commission should be sustained if even one of the stated reasons is sufficient to support it. . . . The evidence, however, to support any such reason must be substantial. . . ." (Citations omitted; internal quotation marks omitted.) Id., 198-99.
 DISCUSSION
As previously set forth, the commission ultimately approved the Friedlaenders' second application, with conditions, "based upon a finding that it conforms with Zoning Code 273-91 of the Town of Guilford. The Commission finds that based on the approval of the sewage disposal system plans by the State Department of Public Health and the Town Engineer, the development of this property will have no adverse impact on Long Island Sound waters. Furthermore the construction of a new septic system will be a significant improvement over the existing substandard system. The Commission also finds that, with the conditions imposed, the house will not adversely effect public views of the water. Finally, the Commission believes that this project will have no other adverse environmental impacts." (ROR, Item 031, pp. 2-3.)
Pinchbeck appeals on the basis that the commission violated her due process rights and acted illegally, arbitrarily, and in abuse of its discretion, in various ways, by approving CAM II. Pinchbeck has briefed the following grounds.
A. Whether the Commission Erroneously Construed CAM II As a Modification Rather Than a New Application
Pinchbeck contends there was confusion concerning the "nature and status" of the Friedlaenders' second application. (Pinchbeck's Brief, p. 16.) Pinchbeck observes that the commissioners debated whether CAM II was to be reviewed from "ground zero," or whether it was bound by its previous decision. Pinchbeck argues that the commission was first required to decide whether a change of circumstances had occurred, or whether other intervening considerations existed that would materially affect the proposal. She maintains, however, that the commission decided neither. She emphasizes that there was a "substantial change in circumstances between the Friedlaenders' [first and second applications]," and she concludes that the commission "was obligated in the first instance to take a fresh look at the entire proposal, and not simply assume that in all other respects the prior approval was binding upon the CT Page 7244 [commission]." (Pinchbeck's Brief, p. 19.)
The Friedlaenders counter that the record "is replete with references to [the Friedlaenders'] submission to the Commission as a revision. . . ." (Friedlaenders' Brief, p. 18.) They argue that the commission "could reasonably appreciate that an intervening definitive approval of the proposed septic system by the State of Connecticut Department of Public Health and the reduction in the size of the rehabilitated house were not `changed circumstances' in derogation of their [previous] decision, but reflected `revisions' to the plan and alterations consistent with the coastal management analysis." (Friedlaenders' Brief, p. 21.) The commission does not address this issue in its brief.[2]
The record contains numerous references characterizing the Friedlaenders' CAM II application as a revision, including the coastal area management report prepared for the Friedlaenders; (ROR, Item 003, p. 2); the legal notice of the October 7, 1998 public hearing; (ROR, Item 029); the October 7 meeting minutes; (ROR, Item 033, p. 3); and the minutes and transcript of the public hearings, as well as the minutes of the commission's deliberative meeting. (ROR, Items 034, p. 5; 036, pp. 89-92, 100; 035, p. 9.)
The transcript of the October 7, 1998 public hearing reveals that the commissioners discussed whether CAM II was a new application or a revised application. (ROR, Item 036, pp. 89-92.) The confusion among the commissioners, however, arose in large part over whether they were bound by the new regulations or the old regulations when "reviewing a revision." (ROR, Item 036, p. 91.) Ultimately, the commission decided to seek legal advice. (ROR, Item 036, pp. 92-95.) At the October 21, 1998 public hearing, the commissioners were informed that town counsel "advised that . . . this is a revision to a previously approved . . . Coastal Site Plan . . . and [that] "would suggest that we consider this application under the rules that . . . applied at the time that the original Coastal Site Plan was approved." (ROR, Item 036, p. 100.)
The minutes of the November 4, 1998 commission meeting also indicate that town counsel had advised the commission "that the status of this application is a revision." (ROR, Item 035, p. 9.)
The Friedlaenders submitted CAM II because Guilford's engineering department informed them by letter that the prior approval of the septic system had been sent in error. (ROR, Item 006.) The letter, dated October 9, 1997, informed the Friedlaenders that their design engineer had been contacted so that modifications to the septic design would "concur with the Public Health Code." (ROR, Item 006.) A revised coastal area management report, dated August 27, 1998, was prepared for the CT Page 7245 Friedlaenders by Delta Environmental Services, and the report noted that the proposed site improvements included "the reconstruction of the house, replacement of the water supply well, complete reconstruction of the wastewater disposal system, repairing and strengthening of the rubble embankment above the high tide line, and landscaping." (ROR, Item 003, p. 2.) The report explained that the commission had approved the former project, "which was essentially the same as the current proposal with a larger building footprint. . . ." (ROR, Item 003, p. 2.) It further noted that "[s]ubsequent to that approval, technical modifications to the proposed wastewater disposal system design were mandated by the State of Connecticut Department of Health. These modifications required that the system be shifted a total of six feet to the east. The relocation of the wastewater disposal system required a corresponding six foot relocation of the western wall and foundation of the residence eastward." (ROR, Item 003, p. 2.) The report observed that the project architect adjusted the southern wall of the proposed structure to compensate for the useable space lost as a result of the required revision, but that the "over all result of the proposed revisions to the previously approved application will be a diminution of the scale of the project. Therefore any potential impacts to the coastal resources resulting from the project, which were considered to be acceptable as evidenced by the town's previous Coastal Site Plan Approval will also be reduced." (ROR, Item 003, p. 2.).
Peter Hornak, a representative of Delta Environmental Services, appeared at the October 7 public hearing and spoke extensively about the required modifications, presenting the commission with a lengthy discourse on CAM issues. (ROR, Item 036, pp. 26-35.) He enumerated the coastal resources located on or adjacent to the site, such as coastal bluffs, escarpments, rocky shorefronts, and tidal wetlands. With respect to the tidal wetlands, he explained there would be no impact because the proposed work would occur above the high tide line. (ROR, 036, p. 29.) Hornak further explained that all construction would "be undertaken in compliance with the Town of Guilford Flood . . . Plain Management Regulations and requirements of the National Flood Insurance Program." (ROR, Item 036, p. 30.)
Hornak noted that the project was consistent with the stated policies for coastal area uses, emphasizing that sedimentation and erosion controls would "be implemented during construction to prevent siltation and coastal erosion," and that the property's "redevelopment was designed to meet all applicable flood plain management regulations." (ROR, Item 036, p. 32.) He emphasized that Delta would supervise the installation of the wastewater disposal system, which had received the approval of the state's department of public health, and that "no negative water quality impacts will result from the project." (ROR, Item 036, p. 32.) He also discussed the items to be considered in a CAM application, such as the CT Page 7246 potential for degradation of water quality in the vicinity of the site. He observed that the newly designed wastewater disposal system, installed under Delta's supervision, would ensure that no water quality degradation would occur. (ROR, Item 036, pp. 32-33.) He also addressed the potential degradation of existing water circulation patterns, stating there would be no increase in freshwater input to coastal waters, and no work would occur below the high tide line. With respect to the CAM issue of "potential degradation of . . . natural erosion patterns through a significant alteration of littoral transport of sediments in terms of . . . deposition or source reduction," Hornak indicated that the project would not affect littoral transport and that the property was not a source of sediment for any beaches. (ROR, Item 036, p. 33.) He also addressed the "potential for degradation of natural or existing drainage patterns through the significant alteration of groundwater flow and recharge and volume of runoff," and concluded that "it may decrease slightly because the actual footprint of the house is . . . overall to be slightly less than what it is now." (ROR, Item 036, pp. 33-34.) He further noted that "with the project there will be no change in coastal flood hazards," the project was designed to meet the flood plain management regulations of the National Flood Insurance Program, and there would be no significant impact of "visual quality of vistas." (ROR, Item 036, p. 34.) He also stated that there would be no negative impact on wildlife, fin fish or shellfish habitats, the coastal resources would be unchanged, and the stone rubble revetment would be constructed in conformance with the "Corps of Engineer's guidelines, and . . . will not . . . significantly change the overall character of the shoreline," nor would the project result in any reduction in future water dependent opportunities. (ROR, Item 036, pp. 34-35.)
Specifically, concerning the modifications required by the department of health, Hornak explained that "the modifications to the waste water disposal system design pursuant to the Department of Public Health comments [have] increased separating distances between the proposed new system and the coastal resources. Therefore . . . the potential impacts on the coastal resources will be further reduced." (ROR, Item 036, p. 35.)
The record further reflects that the commission heard statements from those in opposition to CAM II. Pinchbeck's attorney, Thomas Crosby, spoke, indicating there had been numerous revisions to the original CAM; (ROR, Item 036, pp. 55-59); and questioning CAM II's compliance with both Connecticut's statutes and Guilford's zoning regulations. (ROR, Item 036, pp. 62-66.) Pinchbeck's engineer/land surveyor also appeared at the October 7 hearing, and spoke in opposition to CAM II (ROR, Item 036, pp. 66-74.) The October 7 public hearing was continued to October 21, and, at the October 21 hearing, Pinchbeck's environmental consultant, Penelope Sharp, presented her concerns regarding the project to the commission. CT Page 7247 (ROR, Item 036, pp. 106-114.)
During the October 7 hearing, a commissioner referenced a May 11, 1998 statement of approval with modifications from the state department of health that had been received with respect to the application; (ROR, Items 036, p. 80; 019); as well as a letter from Margaret Welch of the state's Office of Long Island Sound Programs. (ROR, Items 036, p. 80; 004) The letter raised some concerns about the modified plan. Welch concluded, however, that the planned methodology for soil sedimentation and erosion control appeared reasonable, but recommended that the commission specifically require it as a condition of approval. (ROR, Item 036, pp. 80-82; Item 004.) During the October 21 hearing, the president of Delta Environmental Services, Robert Sonnichsen, a professional engineer responsible for the development of the Friedlaenders' plan, addressed concerns that had been raised regarding soil erosion sediment control, the septic system, and the revetment wall. (ROR, Item 036, pp. 119-125.).
While a commission "may review a decision and revoke action once duly taken, it should not ordinarily do so; otherwise there would be no finality to the proceeding and the result would be subject to change at the whim of the [commission] or due to the effect of influence exerted upon [it]. . . ." Middlesex Theatre, Inc. v. Hickey, 128 Conn. 20, 22,20 A. 412 (1941). "Where, [however], a change of conditions has occurred since the decision of the [commission] or where other considerations have arisen materially affecting the merits of the matter and no vested rights have intervened, it is reasonable and appropriate to the functioning of efficient administrative machinery that the subject matter be re-examined in the light of the altered circumstances." Id., 22-23. "The determination as to whether the application under review is substantially the same as the prior application and that circumstances and conditions have not changed so as to affect materially the merits of the application is for the [commission] to determine in the first instance." Bradley v.Inland Wetlands Agency, 28 Conn. App. 48, 51, 609 A.2d 1043 (1992). See also Consolini v. Inland Wetlands Commission, 29 Conn. App. 12, 16,612 A.2d 803 (1992) (whether "new and downsized plan" was within scope of two previously-issued permits is factual question for the commission). Here, the record supports the commission's determination that CAM II was a revised application, rather than a new application. The record reflects that the commission conducted a public hearing and entertained statements both in support of, and in opposition to the application. The record further reveals that the commission heard extensive discussion concerning the revised aspects of the application and the impact of the revisions, or lack thereof, upon the coastal resources.
Accordingly, the commission did not erroneously construe CAM II as CT Page 7248 a modification, rather than as a new application, and that the record demonstrates that the commission thoroughly reviewed the revised aspects of the application with respect to its impact upon coastal resources. Pinchbeck's appeal should not be sustained upon this ground.
B. Whether the Commission Lacked Authority to Table CAM II Once that Application Had Been "Denied."
Pinchbeck also maintains that, at the close of the October 21, 1998 hearing, the commission considered a motion to approve the CAM II application, the vote was tied 3-3-1, and Connecticut law is clear that "the casting of a tie vote defeats the motion." (Pinchbeck's Brief, p. 22.) Citing to the public hearing transcript, she observes that the town planner stated that "`failure to act may constitute approval at the time the statutes run out,'" but that the town planner "`also noted we haven't approved it but we haven't denied it.'" (Pinchbeck's Brief, p. 22.) Pinchbeck contends that the town planner's remarks were erroneous and that such "misinformation motivated the [commission] to table the Friedlaenders' application when it had already been denied." (Pinchbeck's Brief, p. 24.) She argues that, following the denial of the motion to approve, no further action was required and that a "subsidiary motion such as a `motion to table'" violates Robert's Rules of Order. (Pinchbeck's Brief, p. 24.) Pinchbeck further contends that Robert's Rules were violated because, although a "motion to reconsider" properly could have been made at the November 4, 1998 commission meeting, it only could have been made by a member who previously voted with the prevailing side. Instead, she maintains that the November 4, 1998 "motion to approve" was made by a member who had voted against the October 21, 1998 motion. (Pinchbeck's Brief, p. 25.)
The Friedlaenders respond that the commission properly tabled the matter, following the tie vote, to obtain legal advice on the pertinent procedural issues. (Friedlaenders' Brief, p. 22.) They maintain that a commission's decision does not become final until publication of the notice of decision, and that "[n]o publication of decision occurred" following the October 21, 1998 meeting. (Friedlaenders' Brief, p. 23).
The commission agrees with the Friedlaenders' position concerning the commission `s discretion to reconsider a matter following a vote because, here, no notice of the tie vote decision had been published. (Commission's Brief, p. 2.) It further contends that the motion the commission voted on and approved at the November meeting was "materially different from the motion that failed at the October 21 meeting." (Commission's Brief, p. 2.) The commission adds that the November 4, 1998 motion to approve was not a motion to reconsider, but a new motion; therefore, "there was no limitation on which members could make the CT Page 7249 motion." (Commission's Brief, p. 2.)
The October 7 public hearing was continued to October 21. Following the October 21 hearing, a motion to approve a "Revision to a Coastal Site Plan for Gary Friedlaender," with conditions, was put to a vote. (ROR, Item 034, pp. 14, 16.) Three commissioners voted to approve, three voted to deny, and one commissioner abstained. (ROR, Item 034, p. 16.) There was confusion concerning the meaning of this vote, so the commission decided to seek a legal opinion and voted to table this item until its November 4, 1998 meeting.
A decision of a commission is final and, therefore, may not be opened following the publication of its decision. See Sharp v. Zoning Board ofAppeals, 43 Conn. App. 512, 526, 684 A.2d 713 (1996). See also Wight v.Southington, 43 Conn. App. 654, 658, 685 A.2d 686 (1996). "The publication of the decision is the promulgation of [the commission's] final decision. Sharp v. Zoning Board of Appeals, supra, 525. In Toffolonv. Zoning Board of Appeals, 155 Conn. 558, 565, 236 A.2d 96 (1967), the plaintiff claimed that, in determining his appeal, a zoning board illegally voted on his matter on several separate occasions. The board had met on three different dates. During the first meeting, the plaintiffs appeal was put to two votes and the board recessed this meeting in order to seek advice from town counsel concerning the efficacy of the second vote. The appeal was put to another vote during the second meeting, but this meeting was recessed after the board tabled the plaintiffs appeal pending another opinion from town counsel. The meeting was reconvened one more time, whereupon the board again entertained the plaintiffs matter. The court determined that, despite meeting on three different dates, "the three meetings constituted but one session of the board." Id., 565. The court reasoned that, prior to the third meeting, the initial meeting had not been adjourned, "there was no announcement of the board's decision, and no rights of any party intervened. We are not here concerned with a situation in which a board has duly taken final action on a matter and has thereafter entertained an application for a rehearing." Id. The court concluded that "[t]he proceedings on the plaintiffs appeal were not terminated prior to [the third meeting]. The several votes were but steps taken toward a single, final decision." Id., 566.
In this appeal, although the October 21, 1998 meeting was "adjourned,"; (ROR, Item 034, p. 24); the commission's decision with respect to the Friedlaenders' application was not final. Following the tie vote, the commission voted to table[3] the matter to the November 4, 1998 meeting, and no published decision resulted from the October 21 vote.
Pinchbeck also argues that the commission violated Robert's Rules CT Page 7250 of Order because a "subsidiary motion" such as a motion to table may only be raised with a "main motion," and that the motion to approve, made at the November 4 meeting, should have been made by a member voting with the "prevailing side," but was made by a member who had voted against the original proposal.
The commission has supplied the court with a copy of Guilford's zoning regulations; (Supplemental ROR); however, this court has found no regulation requiring the commission to comply with Robert's Rules. Nor is this court aware of any "official bylaw . . . or statute [mandating] the [commission to] strictly comply with Robert's Rules." Maple LeafConstruction, Inc. v. Zoning Board of Appeals, judicial district of Tolland at Rockville, Docket No. 56938 (May 17, 1996, Rittenband, J.) Even if the commission were statutorily required to comply with Robert's Rules, Pinchbeck has failed to demonstrate that she has suffered any prejudice as a result of the commission having tabled the Friedlaenders' application following the tie vote. See Maple Leaf Construction, Inc. v.Zoning Board of Appeals, supra, (court determines that alleged procedural deficiencies in board's voting procedure were either unfounded or constituted harmless error where plaintiff failed to demonstrate prejudice). Accordingly, the court should not sustain Pinchbeck's appeal on this ground.
C. Whether the Commission Erroneously Found that CAM II Had No Adverse Impact Upon Coastal Resources or Reduced Visual Impact
Pinchbeck emphasizes that a commission must consider both coastal management and zoning concerns. She maintains, however, that CAM II fails to comply with Guilford's R-2 zone setback requirement, it fails to comply with certain Coastal Area Management Act goals that are incorporated in the Guilford regulations, and it does not comply with the visual access guaranteed by the Guilford regulations. (Pinchbeck's Brief, pp. 26-30).
The Friedlaenders respond that CAM II complied with the requirements of the Coastal Management Act and the requirements of the Guilford Zoning Code and that the commission's findings are supported by substantial evidence in the record. (Friedlaenders' Brief, pp. 13-18.)
Initially, Pinchbeck argues that the Guilford zoning regulations provide for an eight foot setback in an R-2 zone, but the site plan reveals that "there is at most a five (5) foot distance between the side yard bordering the Pinchbeck property and the foundation of the Friedlaenders' first floor. . . . Thus, the second story of the Friedlaenders' proposed addition will not be set back the required 8 feet." (Emphasis in original.) (Pinchbeck's Brief, p. 27.) The site plan CT Page 7251 depicts the Pinchbeck residence in relation to the Friedlaenders' proposed construction. (ROR, Item 037, p. 1.)
At the February 29, 2000 hearing before this court, Charles Andres, appearing on behalf of the commission, represented that the setback issue "is the subject of a separate litigation and that is going on as well between the parties." (2/29/00 TR., pp. 31-32.) He stated that "[t]he original application was filed in 1997. They got to the point that Attorney Crosby did mention passing the setback land, and what they had to do with the interpretation of the Guilford zoning regulations concerning an existing nonconforming building. I believe there was eight yards-eight [feet] of setback and only five feet, and they were going to go further into the setback going up. So the question is when you have a vertical expansion existing in a nonconforming structure, whether that extension is nonconforming. That whole issue is the subject of a separate litigation and that is going on as well between the parties. Attorney Crosby raised that to the zoning enforcement officer saying you need a variance for this and the zoning enforcement officer said, `[n]o, we don't consider that to be an expansion of nonconformity.' This went to the ZBA and the ZBA upheld the zoning enforcement officer's decision. Then, it became a Superior Court case and got dismissed on procedural grounds, and now it is at the Appellate Court, and we are awaiting a decision on it." (2/29/00 TR., pp. 31-32.)
Attorney Crosby, appearing on behalf of Pinchbeck, responded to Andres' assertions by claiming that, with respect to the regulations, "there are two sections, one of which I do have an ongoing piece of litigation, which is ongoing, and the other one is 273-27, which has not changed in the last couple of years . . . and it says that any new building added or structure shall be set back. There are requirements for distances for the rear and side property lines specified in Table 3. There is a section that has nothing to do with this other litigation, which I think says that if you are going to have any new addition or building structure, it has to be set back to an acquired distance." (Tr., pp. 33-34.)
This court takes judicial notice of the earlier appeal referred to by the parties, Pinchbeck v. Zoning Board of Appeals, Superior Court, judicial district of New Haven at New Haven, Docket No. 412007 (setback appeal). After examining the court file, the setback issue underlying that appeal is essentially the same setback issue that Pinchbeck raises in the present appeal.
By way of background, the setback appeal was commenced on March 9 and 10, 1998, and it resulted from the following. On July 23, 1997, the zoning board of appeals granted the Friedlaenders' application for a front yard setback variance. There was a notation on the application that CT Page 7252 the zoning enforcement officer (ZEO), indicated that a side yard variance for a height increase was not required. Pinchbeck wrote to the ZEO requesting a written opinion on the issue. On October 23, 1997, the ZEO responded that the proposed addition of a second story to the premises would not require a variance because the structure had a legal nonconforming side yard setback and a vertical increase was not an increase in the nonconformity. On November 6, 1997, Pinchbeck appealed this determination to the ZBA, which denied the appeal. Pinchbeck appealed this denial to the Superior Court, but the court, Downey, J.,
dismissed the appeal on the ground that it lacked jurisdiction to entertain the matter because Pinchbeck had failed to exhaust her administrative remedies. The court reasoned that Pinchbeck had notice of the side yard variance issue at some point prior to July 23, 1997, had the opportunity to be heard on the issue on July 23, 1997, and had the right to appeal from that decision within the statutory time period but had failed to do so. The Appellate Court granted Pinchbeck's petition for certification on September 9, 1998, and, by decision dated May 30, 2000, the Appellate Court reversed the decision of the trial court. Pinchbeckv. Zoning Board of Appeals, 58 Conn. App. 74, ___ A.2d ___ (2000). The Appellate Court observed that the threshold issue was whether any order, requirement or decision was made by the ZEO, thereby triggering the statutory framework for appealing from that decision. Id., 79. The court determined that no evidence had been presented at the hearing on the motion to dismiss to support this necessary finding. Id. The Appellate Court reversed the trial court and remanded the case for further proceedings.
In the setback appeal, Pinchbeck had alleged that the ZBA acted illegally, arbitrarily and in abuse of its discretion, in part, because "Guilford Zoning Regulation Section 273-27 requires all additions to be set back the required distance and the required side yard set back is 8 feet and the defendants Friedlaenders have only 4'-5' of side yard adjacent to plaintiffs property. . . ."(Appeal, ¶ 15(b)). In the present appeal, Pinchbeck argues that the Friedlaenders' coastal site plan violates the eight-foot setback requirement of § 273-27. Pinchbeck has already availed herself of the opportunity to appeal this issue, and that appeal is still alive. See Pinchbeck v. Zoning Board ofAppeals, Superior Court, judicial district of New Haven at New Haven, Docket No. 412007. Accordingly, in the interests of fostering the conservation of judicial resources, the court may proceed with further proceeding consistent with the opinion.
Pinchbeck further claims that CAM II fails to comply with Guilford regulation § 273-91. This regulation provides that buildings, uses and structures located within the coastal boundary are subject to the coastal site plan review requirements and procedures contained in CT Page 7253 General Statutes §§ 22a-105 through 22a-109. (Supp. ROR, Regulations.) She also contends that there is a lack of compliance with Guilford zoning regulation § 273-91(D), which provides that waterfront property shall be developed in a manner so as to maximize visual access to and from the water.
"In appraising the sufficiency of this record, the court must determine only whether there was substantial evidence which reasonably supported the administrative decision. . . ." Feinson v. Conservation Commission,180 Conn. 421, 425, 429 A.2d 910 (1980). "The credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency." (Brackets omitted; internal quotation marks omitted.) Huck v. Inland Wetlands Watercourses Agency,203 Conn. 525, 540-41, 525 A.2d 940 (1987). As detailed in Part A of this memorandum of decision, this court has found that the record supports the commission's determination that CAM II was a revised application, rather than anew application. Despite this determination, however, as discussed in Part A of this opinion, the commission reviewed extensive documentation, and heard from a number of experts with respect to the issues surrounding the project's potential impact upon coastal resources.
With respect to the impact on public views, the record reveals that the project's frontage along the road is 102 feet, the existing width is 29 feet, 8 inches, with a ratio to the frontage equaling 29%. (ROR, Item 008.) The proposed increase is 6 feet, 4 inches, and the new ratio to frontage is 35%. (ROR, Item 008.) The Friedlaenders' attorney raised the issue of visual access during the October 7, 1998 public hearing. She stated that the project involved "no negative view impacts from this." (ROR, Item 036, p. 15.) She further stated "there is really no change in view from the water except that the sensitively rehabilitated structure will be an attractive presence completely in scale with its surroundings and the houses in the neighborhood." (ROR, Item 036, p. 15.) The Friedlaenders' architect emphasized that "there is no change to the views . . . along Mulberry Point Road . . . that the public now enjoy. . . . [A]long . . . the east west direction along the north property line in particular . . . there is a benefit to the neighbors to the north and anyone looking . . . diagonally through the lot . . . because there will be . . . greater views through this corner where the septic system is being constructed and the house is shortened." (ROR, Item 036, pp. 20-21.) Commissioner Barry inquired how much the view from the public street would be blocked, and the architect replied that it was "[t]he same that was proposed in the previous hearing for . . . someone walking down the street, it is . . . the same." (ROR, Item 036, p. 38.) The architect explained that the ceiling height was increased, but that it was well within the zoning envelope, and that there was a six foot reduction on one side, so that people walking down the street could see more "between CT Page 7254 the two Pinchbeck structures and out to the waters of Long Island Sound." (ROR, Item 036, p. 43.) Conversely, at the hearing, Pinchbeck's attorney claimed that the height of the house would minimize visual access. (ROR, Item 036, pp. 64-66.)
The commission considered the visual access issue and expressly determined, in relevant part, that "prior to issuance of a Building Permit; . . . (b). [t]he architectural plans be revised to reduce the building height by two (2) feet. . . ." (ROR, Item 031, p. 2.) The commission further decided that "[t]his application is approved, based upon a finding that it conforms with Zoning Code 273-91 of the Town of Guilford. The commission finds that based on the approval of the sewage disposal system plans by the State Department of Public Health and the Town Engineer, the development of this property will have no adverse impact on Long Island Sound waters. Furthermore the construction of a new septic system will be a significant improvement over the existing substandard system. The Commission also finds that, with the conditionsimposed. the house will not adversely effect public views of the water.
Finally, the Commission believes, that this project will have no other adverse environmental impacts." (Emphasis added.) (ROR, Item 031, pp. 2-3.)
This court observes that Pinchbeck raised the issue of visual access in a prior appeal, Pinchbeck v. Guilford Planning and Zoning, Superior Court, judicial district of New Haven at New Haven, Docket No. 408265, an appeal which this court dismissed on March 11, 1999. Nonetheless, for purposes of the present appeal, this court finds that, based upon the record evidence, the commission could have found that the project would not adversely impact the public's visual access.
Accordingly, the court should not sustain the appeal on this ground.
D. Whether the Commission Erroneously Failed to Postpone the October 7, 1998 Public Hearing
Citing to her status as an intervenor, Pinchbeck further contends thatif CAM II was truly a revision, then the commission violated her due process rights by failing to provide her with a copy of the revised plans. (Pinchbeck's Brief, pp. 30-31.
The Friedlaenders counter that Pinchbeck was not prejudiced by the commencement of the public hearing on October 7, 1998. They maintain that, because the hearing was continued to October 21, 1998, Pinchbeck's attorney and engineer had an opportunity to speak, and that Pinchbeck's environmental consultant also participated in the October 21 hearing. Further, they observe that written commentary by Pinchbeck's engineer was CT Page 7255 submitted at the October 7 hearing, indicating that he had obtained a copy "of the plan titled `Subsurface Wastewater Disposal System Repair' Friedlaender Residence. . . ." (Friedlaenders' Brief, p. 24). They emphasize that the engineer's comments reveal that Pinchbeck had "ample opportunity" to review the plans prior to the public hearing and that the engineer's observations support the commission's conclusion that CAM II represented a revision to the "previously approved" CAM I. (Emphasis added.) (Friedlaenders' Brief, p. 25). The commission fails to address this issue.
The court finds that Pinchbeck suffered no prejudice as a result of the commencement of the public hearing on October 7, 1998. The Friedlaenders' attorney spoke to Pinchbeck's attorney on September 24 or 25, informing him of the pending application and, between that time and October 7, Pinchbeck's attorney failed to request any materials relating to the application. (ROR, Item 036, pp. 6-7.) The commission continued the hearing to October 21, 1998, and a review of the hearing transcript reveals that the commission provided Pinchbeck's attorney, her environmental engineer, and her professional engineer the opportunity to offer a lengthy, detailed presentation. In addition, by letter dated October 7, 1998, Pinchbeck's engineer wrote to the town planner, informing the town planner that he had been retained by Pinchbeck "to review the revised plans submitted for the above referenced CAM application for compliance" with the health code, with subsurface sewage disposal system for households, "and also for its practical design content as pertains to the site." (ROR, Item 018, p. 1.) This letter indicates that the engineer had performed an in-depth review of the revised plans by the date of the October 7 hearing.
Based upon the foregoing reasons, the court should not sustain the appeal on this ground.
E. Whether the Commission Members, or Their Staff, Were Biased and Predisposed Against Pinchbeck.
Pinchbeck cites to various comments made by the chairman and the town planner during the October 7, 1998 public hearing, which, she contends, "do not engender the public confidence that this was a fair and impartial hearing." (Pinchbeck's Brief, p. 32.) In addition, she maintains that "no denial motion, but only a motion to approve was prepared for the October 21, 1998 public hearing. . . . If this hearing was impartial and fair, then a denial motion would have been prepared. It wasn't until the November 4, 1998 hearing." (Pinchbeck's Brief, p. 32.)
The Friedlaenders counter that because "the Chairman was civil to [the Friedlaenders] and that the Commission was not certain of the procedural CT Page 7256 significance of its actions and alternatives and sought to verify' such information through advice of counsel are insufficient grounds to invalidate the substantial proceedings that were undertaken prior to the final decision in this matter and in which proceedings [Pinchbeck] took substantial part." (Friedlaenders' Brief, p. 26.)
The commission contends that the remarks cited by Pinchbeck merely "reflect a polite attempt to indicate that the commission understood the expert's remarks and wished to move forward with the hearing. Likewise, the Town Planner's remarks following the tie vote simply reflect a genuine question as to the significance of a tie vote, to which the Commission properly requested the advice of Town Counsel." (Commission's Brief, p. 7) The commission further maintains that it is not significant that the commission may not have prepared a denial motion for the October 21 hearing, because the commission was "capable of denying the application without a draft motion, as its actions indicated. Moreover, a draft denial motion was prepared for the November 4, 1998 deliberation session." (Commission's Brief, p. 7.)
"Neutrality and impartiality of members are essential to the fair and proper operation of a planning and zoning commission. . . . The evil to be avoided is the creation of a situation tending to weaken public confidence and to undermine the sense of security of individual rights which the property owner must feel assured will always exist in the exercise of zoning power. . . . [B]ias can take the form of favoritism toward one party or hostility toward the opposing party; it is a personal bias or prejudice which imperils the open-mindedness and sense of fairness which a zoning official in our state is required to possess. . . . The decision as to whether a particular interest is sufficient to disqualify, however, is necessarily a factual one and depends upon the circumstances of the particular case." (Citations omitted; internal quotation marks omitted.) Cioffoletti v. Planning Zoning Commission,209 Conn. 544, 553-54, 552 A.2d 796 (1989), overruled on other grounds,245 Conn. 551, 582, 715 A.2d 46 (1998). A bias charge "must be supported by some evidence proving probability of bias before an official can be faulted." (Internal quotation marks omitted.) Huck v. Inland Wetlands Watercourses Agency, 203 Conn. 537, supra. "Because public officers, acting in their official capacities, are presumed, until the contrary appears, to have acted legally and properly . . . the burden on such a claim rests upon the person asserting it." (Citations omitted; internal quotation marks omitted.) Id.
Initially, Pinchbeck refers to a brief colloquy that occurred between Friedlaender and chairman Kingsbury, following Kingsbury's refusal toallow Friedlaender the opportunity to rebut the presentation of Pinchbeck's experts. (ROR, Item 036, p. 75.) Friedlaender remarked upon CT Page 7257 the irrelevance and outdatedness of "many of the comments that [the commission] heard tonight." (ROR, Item 036, p. 76.) Kingsbury responded that he thought they did, but he later elaborated "we don't tend to lean one way or the other"; (ROR, Item 036, p. 76.); and he emphasized "what we operate on is what we hear." (ROR, Item 036, p. 77.) The chairman's refusal to allow Friedlaender rebuttal time, and the latter statements tend toward a finding of lack of bias and predetermination. Further evidence of the commission's impartiality is found during the October 21 public hearing continuation when the commission delayed the Friedlaender matter from 7:33 until 9:02 to await the delayed arrival of Pinchbeck's environmental expert. (ROR, Item 036, pp. 99-105.)
Pinchbeck also maintains that the confidence in a fair hearing was impaired by the advice the town planner gave the commission after the tie vote following the October 21 meeting, and because no denial motion had been prepared for the October 21 meeting. The town planner's suggestions following the vote merely evidence a question as to the significance of a tie vote relative to the Friedlaender's CAM II. In addition, the commission did prepare, and present, its draft motion for denial at the time the vote was taken at its November 4, 1998 deliberative session. (ROR, Item 028.)
For the reasons set forth above, Pinchbeck has not demonstrated bias or prejudgment on the part of the commission; therefore, the court should not sustain the appeal on this ground.
 CONCLUSION
For the foregoing reasons, the court hereby dismisses the Pinchbeck's appeal.
Robert P. Burns Judge Trial Referee